WALLACE CORPORATION v. NATIONAL LABOR RELATIONS BOARD et al.

RICHWOOD CLOTHESPIN & DISH WORKER'S UNION v. NATIONAL LABOR RELATIONS BOARD.

Nos. 5135, 5163.

Circuit Court of Appeals, Fourth Circuit.

Feb. 3, 1944.

R. Walston Chubb, of St. Louis, Mo. (Brooks B. Callaghan and Wolverton & Callaghan, all of Richwood, W. Va., Charles S. Glazer, of Dallas, Tex., and Lewis, Rice, Tucker, Allen & Chubb, of St. Louis, Mo., on the brief), for petitioner.

M. E. Boiarsky, of Charleston, W. Va., for petitioner Richwood Clothespin & Dishworkers' Union.

Ivar Peterson, Asst. Gen. Counsel, National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Joseph B. Robison and Marcel Mallet-Prevost, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondents.

Before PARKER, SOPER and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

These are petitions by the Wallace Corporation, a company operating a woodworking plant at Richwood, W. Va., and an independent union of its employees to review and set aside an order of the National Labor Relations Board. The Board found that the company had violated section 8(2) of the National Labor Relations Act, 29 U.S.C.A. § 158(2), by dominating, interfering with and supporting the independent union, had violated section 8(3) by discriminatorily discharging 43 employees, and in these respects and otherwise had violated section 8(1) by interfer-

ing with, restraining and coercing its employees in the exercise of rights guaranteed by section 7, 29 U.S.C.A. § 157. The order requires the company (a) to cease and desist from the unfair labor practices found; (b) to withdraw recognition from, completely disestablish, and cease giving effect to any agreement with the Independent; (c) to offer reinstatement with back pay to the 43 employees who were discriminatorily discharged; and (d) to post appropriate notices.

There is evidence in support of the Board's order to the effect that in July, 1941, a local union of the C. I. O. instituted a campaign for the purpose of organizing the company's employees and that officials and supervisory employees of the company made anti-union statements in discouragement of the campaign with threats that the president of the company would never recognize the union and that, if the employees did organize, he would shut the plant down and move it away. Early in September, the union claimed a majority of the employees and demanded recognition as bargaining representative. The plant manager refused to accept the application cards for union membership unless he were allowed to question each of the applicants individually and suggested that an election be held. The union refused to agree to an election unless an employee who had been prominent in organizational activities and who had been discharged were restored to his position. The company refused to accede to this condition and a strike was called which became effective on September 25th.

Following the calling of the strike, the independent union was organized. There is evidence from which it may be properly inferred that a foreman and employees who acted from time to time as assistant foremen had a part in its organization, and that the anti-union attitude of the company coupled with a back-to-work movement which the company sponsored was an important factor therein. The C. I. O. union filed a charge of company domination with the Board following the organization of the Independent; and this complaint was pending in January, 1942, when an agreement was entered into between all parties by the terms of which the charge of domination was withdrawn, it was agreed that an election be held to choose between the C. I. O. and the Independent as bargaining representative and the company agreed to enter into a "union shop" agreement with the winner in the election. An election was held on January 30th and the Independent received 98 votes and the C. I. O. union 83, although a total of 207 employees was eligible to vote. The Independent was thereupon certified by the Board as the bargaining representative of the employees.

Following its certification, the Independent demanded that the company execute a closed shop agreement with it and clearly indicated to the company that one of the purposes of such agreement was to get rid of employees who were unacceptable because of prior union activities. In a letter of February 28th to the company the agent of the Independent said:

"The 'closed shop' will, therefore, give us some control in preventing the hiring of additional employees who are unfavorable to our interests and who would further jeopardize our majority. It would also provide us with a legal means of disposing of any present employees, including Harvey Dodrill whom our members have declared by unanimous ballot that they will not work with, whose presence in the plant is unfavorable to our interests because those who are so unfavorable will not be permitted to become members of our organization and without such membership they would not be permitted to work in the plant under a closed shop contract which we respectfully insist that we MUST have."

The company opposed signing a closed shop contract with the Independent, and its attorney strongly advised against such action, but notwithstanding his advice and notwithstanding the notice contained in the letter above quoted of the intention of Independent to use the closed shop agreement to discriminate against employees and cause their discharge because of prior union activities, the company signed the contract. Pursuant to the contract, it discharged 43 of the former employees who had taken part in the effort to organize the C. I. O. union because they had not become members of the Independent, although it knew that 31 of these employees had applied for membership in the Independent and had been rejected. Subsequent letters on the part of the company to the Independent, suggesting that these employees be accepted as members, show that the company understood that they had been rejected by the Independent because of the

labor strife which had preceded the election. After the discharge of these employees additional charges were filed against the company, and the Board entered the order which we are asked to review.

■ In the absence of the consent election and the certification of Independent as a bargaining agent by the Board, there could be no question as to the correctness of the Board's order. The evidence as to anti-union statements by the company's supervisory employees, the assistance that these necessarily gave in the organization of the Independent and the participation of employees having supervisory powers in its organization is analyzed in the Board's order and need not be repeated here. It amply sustains the Board's findings. N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; Id., 4 Cir., 132 F.2d 390; International Ass'n of Machinists v. N. L. R. B., 311 U. S. 72, 80, 81, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 518–521, 61 S.Ct. 320, 85 L.Ed. 309; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 598, 599, 61 S.Ct. 358, 85 L.Ed. 368; N. L. R. B. v. Norfolk Shipbuilding and Dry Dock Corp., 4 Cir., 109 F.2d 128, 129; N. L. R. B. v. Wallace Mfg. Co., 4 Cir., 95 F.2d 818.

■ We do not think that the consent election and certification of the Independent as bargaining agent for the Board precluded consideration by the Board of matters occurring prior thereto for two reasons: (1) Because the discharge of the employees under the circumstances here appearing was properly found by the Board to be an unfair labor practice, notwithstanding the closed shop agreement, and, upon this finding, it was proper for the Board to consider the entire history of the controversy leading up to the discharges and enter an order that would afford appropriate relief, and (2) because the power of the Board in relieving against unfair labor practices is not limited by agreements between employers and employees made with its approval or by administrative orders that it has entered, and while it might amount to an abuse of discretion to ignore these under some circumstances, the Board was justified in ignoring them here because of the oppressive and high handed conduct of the parties, which was clearly violative of the spirit of the agreement under which the election was held, whether constituting an unfair labor practice within the meaning of the statute or not.

■ As to the first proposition, it is of course true that closed shop contracts are authorized by the act; and ordinarily unfair labor practice cannot be predicated on the discharge of an employee because he is not a member of the union holding a closed shop contract with the employer. Sec. 8(3) of the act 29 U.S.C.A. § 158(3). This provision of the act must be construed, however, in the light of the general purpose of the statute, which was to provide representation for all employees by an agent chosen by the majority and was never intended to authorize the majority to discriminate against a minority because of prior union or anti-union activities. This does not mean that either the courts or the Board are given any control over the membership of a union holding a closed shop contract. It means merely that such a contract does not excuse a discharge when membership in the union to the knowledge of the company is denied on the ground of activity in prior labor disputes. As was well said by the Board in its decision in this case:

"An employer may not enter into a closed-shop contract which to his knowledge is designed to operate as an instrument for effecting discrimination against his employees solely because of their prior union activities. The proviso in section 8 (3) of the Act permits an employer to enter into an agreement with the duly designated representative of his employees, requiring membership in that organization as a condition of employment. It is true that under the terms of the election agreement the respondent was bound to execute a union-shop contract with the victorious union. It by no means follows, however, that the respondent was also bound by the election agreement to acquiesce in a scheme to penalize employees whose choice of representatives was not that of the majority; nor can the proviso in section 8 (3) be thought to countenance such a result."

See also matter of Rutland Court Owners, Inc., 44 N. L. R. B., 587, 46 N. L. R. B. 1040; Matter of Monsieur Henri Wines, Ltd., 44 N. L. R. B. 1310.

■ It is to be noted that the agreement under which the election was held

provided that the company should enter into a "union shop" contract with the union successful in the election. A "union shop" contract meant that the employees of the company would be required to become members of the successful union as a condition of retaining their employment, not that the successful union might have discharged from employment those who had been on the opposite side of the dispute even though they were willing to become members, by the simple device of denying them membership. When the letter of the Independent disclosed to the company that it was intended to use the closed shop contract to bring about the discharge of employees on account of prior labor activities, the company should have refused to sign a contract without making adequate provision for the protection of their rights. It was bound to bargain with the independent union as the duly certified bargaining agent, but it was not bound to enter into a contract which it was notified would be used for an improper purpose. It had agreed to negotiate a union shop contract; but it had not agreed to enter into such a contract as might be used to do an injustice to employees; and, in view of the letter it had received, it should have seen that provisions were inserted in the contract that would have protected their rights. It would not be fair to the company to say that it conspired with the independent union to bring about the discharge of troublesome members of the opposite union. It is fair to say, however, that it entered into the closed shop contract knowing that the Independent intended to do precisely that, and that it discharged employees who had sought and been denied membership in the Independent, when it knew that they were denied membership because of prior union activities. The Board, we think, was justified in finding that this was an unfair labor practice and upon such finding was justified in considering in connection therewith the unfair labor practices which had occurred prior to the agreement and election. Canyon Corp. v. N. L. R. B., 8 Cir., 128 F.2d 953, 955; Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 931; N. L. R. B. v. Hawk & Buck Co., 5 Cir., 120 F.2d 903.

 And, even if discharges such as those here involved be not considered of themselves unfair labor practices within the meaning of the act, we think that the Board was justified under the circumstances, notwithstanding the agreement that had been made and the certification of the Independent, in going fully into the question of company domination and holding the Independent to be a company dominated union and hence not entitled to invoke the closed shop provision. Cf. N. L. R. B. v. Electric Vacuum Cleaner Co., 315 U.S. 685, 694, 62 S.Ct. 846, 86 L.Ed. 1120. The Board's power to prevent unfair labor practices is not limited by agreements that may have been made. 29 U.S.C.A. § 160. And administrative orders, such as those involved in the designation of bargaining agents, furnish no occasion for the application of the principle of res adjudicata and do not bar further action by the Board. N. L. R. B. v. Baltimore Transit Co., 4 Cir., 140 F.2d 51. Settlements approved by the Board should ordinarily be observed and administrative orders should not be lightly disregarded (Cf. Matter of Simplicity Pattern Co., 16 N. L. R. B. 291); but these are guides for the exercise of discretion by the Board, not limitations upon its power. It is the duty of the Board to prevent unfair labor practices; and the fact that it may have certified a union as a bargaining representative does not limit its power later to declare such union to be company dominated and order its disestablishment, if such course is seen to be proper in the light of subsequent developments. The high-handed conduct of the Independent union here, in violation of the clear spirit of the compromise agreement as well as of the rights of the minority, and the acquiescence of the company in that conduct, furnished ample justification for the Board to inquire fully into the history of the union and determine whether it was a fit bargaining agency within the meaning of the act.

 The provision as to back pay appears rather hard upon the company in view of the protests made by it to the Independent union with respect to the discharges; but this was a matter for the Board and not for us. The case must be viewed in the light of the rights of the discharged employees as well as of the company; and when they have suffered injustice and hardship as the result of unfair labor practices in which the company has participated, it is for the Board and not us to say what action is appropriate to remove the effect of these practices. And the thought occurs that, if the com-

pany had not interfered with the organization of its employees in the first instance, or had protected the rights of the minority when put on notice that the Independent intended to use the closed shop contract to do them an injustice, it would not have been placed in position to suffer from the effects of an order relating to unfair practices.

The order of the Board will be enforced.

Order enforced.