NATIONAL LABOR RELATIONS BOARD
v. NORFOLK SOUTHERN BUS
CORPORATION.

No. 5521.

Circuit Court of Appeals, Fourth Circuit.

Dec. 30, 1946.

Writ of Certiorari Denied March 31, 1947.

See 67 S.Ct. 1085.

SOPER, Circuit Judge, dissenting.

———◆———

Louis Newman, Atty., National Labor Relations Board, of Washington, D. C. (Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Owsley Vose and Jerome Wohlmuth, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

James G. Martin, of Norfolk, Va. (S. Burnell Bragg and Arthur J. Winder, both of Norfolk, Va., on the brief), for respondent.

Before PARKER, SOPER and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board against the Norfolk Southern Bus Corporation, hereafter called the company, a subsidiary of the Norfolk Southern Railway Company. The Board affirmed findings of a Trial Examiner to the effect that the company in violation of sections 8(1) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 5), had interfered with, restrained and coerced employees in the exercise of the rights of self organization and collective bargaining and had refused to bargain collectively with a union which the Board had certified as the bargaining representative of certain employees in its Virginia division. It entered an order in the ordinary form directing the company to cease and desist from its unfair labor practices and bargain with the union. The company opposes enforcement of the order on two grounds: (1) that the findings as to interference, restraint and coercion are not supported by the evidence, and (2) that the Virginia division was not an appropriate bargaining unit for the employees represented by the union and that the certification by the Board was void as being an arbitrary and unreasonable exercise of power on its part.

The controversy has arisen out of an attempt on the part of the union to organize the company's bus drivers and conductors and the opposition to organization on the part of some of the company's supervisory employees. The company's service is operated in two divisions called respectively the Virginia and North Carolina divisions. A majority of the drivers and conductors in the Virginia division were in favor of organization, while practically all of those in the North Carolina division were opposed to it. The Board, on petition, held the Virginia division a proper unit for the purposes of collective bargaining and ordered an election, which resulted in the choice of the union as bargaining representative. The company refused to bargain with the union and this refusal is charged as an unfair labor practice, along with interference with union organization by questioning of union members and expressions of hostility to the union on the part of supervisory employees, and by participation of the company and its supervisory employees in the establishment of a "grievance committee" as a bargaining agency to forestall the selection of the union.

The company admits refusal to bargain with the union; and whether or not this was an unfair labor practice depends on whether or not the Virginia divi-

sion was properly designated as a bargaining unit. As to the other unfair labor practices, little need be said. While there is some conflict in the evidence, there is ample support for the findings approved by the Board to the effect that supervisory employees of the company questioned employees with regard to union membership, made anti-union remarks under circumstances calculated to interfere with the free action of the employees in selecting a bargaining agent, and, on at least one occasion, indicated that those who sought the aid of the union would receive less favorable treatment from the company than other employees. There is support also for the finding that the company promoted and sponsored the grievance committee as a bargaining agent to forestall the selection of the union. On such findings, we think it quite clear that the cease and desist order was justified. Questioning of employees concerning union membership and activities and disparaging remarks by supervisory employees made in such way as to hamper the exercise of free choice on the part of the employees, have been uniformly condemned as violation of the Act. H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 518, 519, 61 S.Ct. 320, 85 L.Ed. 309; Virginia Electric & Power Co. v. N.L.R.B., 4 Cir., 132 F.2d 390, 392–395; N.L.R.B. v. Baltimore Transit Co., 4 Cir., 140 F.2d 51, 56; Piedmont Shirt Co. v. N.L.R.B., 4 Cir., 138 F.2d 738. Promotion and sponsorship by the employer or his supervisory employees of an organization for collective bargaining is likewise condemned. N.L.R.B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 268, 269, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Virginia Ferry Corporation v. N.L.R.B., 4 Cir., 101 F.2d 103; Wallace Corporation v. N.L.R.B., 4 Cir., 141 F.2d 87, 89, 90; American Enka Corporation v. N.L.R.B., 4 Cir., 119 F.2d 60, 61, 62, 63. In the case last cited we said: "Seldom does the domination and interference with employee representation which the Act prohibits take the form of threats or coercion. More often it is to be found in the guise of friendly cooperation; and the purpose of the Act is to prohibit anything which will enable the employer to exert influence on the rep-

resentatives of the employees in the collective bargaining which it is the purpose of the Act to promote. When the employer himself assists in setting up the bargaining agency, provides the machinery by which the bargaining representatives are chosen, allows the elections to be conducted on his premises and at his expense and pays the representatives for the time devoted to bargaining, he is manifestly taking too great a part in a matter with which he is supposed to have nothing whatever to do. Collective bargaining becomes a delusion and a snare if the employer, either directly or indirectly, is allowed to sit on both sides of the bargaining table; and, with the great advantage that he holds as the master of pay and promotions, he will be on both sides of the table if he is allowed to take any part whatever in the choice of bargaining representatives by the employees."

We come then to the Board's determination of the bargaining unit. The facts on which this determination was made are tersely and accurately stated by the Board as follows: "The company's bus operations are organized into two divisions, known respectively as the Virginia division, which comprises routes confined, with one exception, to the State of Virginia, and the North Carolina division, which includes routes in the two States of Virginia and North Carolina, with the greater part of the runs in the latter State. For certain purposes, the two divisions are treated by the company as distinct entities. Each division, for example, has its own seniority list, so that if a driver transfers from one division to the other, he does not carry his seniority with him but goes to the bottom of the seniority list in his new division. Each driver or conductor is definitely assigned to one division or the other and among regular drivers there is very infrequent interchange on a permanent basis; in case of emergency, a regular driver in one division may, on a purely voluntary basis, accept a run in the other division. Further, each division is in charge of a separate bus master."

After pointing out the above facts as indicating the propriety of a divisional unit,

the Board adverted to other considerations which would have made a company wide unit appropriate, but gave its decision that the divisional unit was the appropriate one here because of the possibility of organizing the employees in the Virginia division and the opposition to organization in the North Carolina division. In this connection the Board said: "While the factors adverted to indicate the propriety of a division unit, there are other considerations which point up the equal propriety of a company wide unit; wages and working conditions are the same for employees throughout the system; all busses are serviced at the same garage; the dispatcher at Norfolk acts in his capacity for the two divisions; and general administration and employment policies are handled centrally. However, the union has limited its organization activities to employees of the Virginia division since those in the North Carolina division have indicated their hostility to the union and there is no present possibility of organizing the latter division. In view of the foregoing, and in the absence of any bargaining history, we are of the opinion that at this time a unit confined to employees of the Virginia division is appropriate. We do not thereby preclude future reconsideration of the appropriateness of a larger unit, should organization of the company's employees be extended."

■■ The designation of the bargaining unit is one committed by the Act to the discretion of the Board;* and, in view of the fact that the company itself distinguishes between its Virginia and North Carolina divisions, having a separate seniority list for each and dealing with the drivers in each through a separate bus master, we cannot say that the adoption of the division by the Board as a bargaining unit was arbitrary or unreasonable. The fact that employees are situated in different towns has been adjudged a sufficient reason for limiting the bargaining unit to one town, although there were the same reasons for a company wide unit that exist here. N.L.R.B. v. Appalachian Electric Co., 4 Cir., 140 F.2d 217. The fact that the employees travel over different territory in their work, instead of remaining stationary, does not seem a sufficient reason for curtailing the discretion of the Board in the one case and not in the other. The fact that employees work in different plants for the same employer would certainly constitute sufficient basis for making either of the plants a bargaining unit; and we see no reason why a division of bus territory should not stand on the same footing.

■ It is clear, however, that the Board, while holding that the division was an appropriate unit, was of opinion that a company wide unit would also be appropriate, and, in making its determination in favor of the divisional unit, took into consideration the fact that organization for collective bargaining was possible in the division but not for the wider unit. The question arises whether in giving consideration to such matter the Board was guilty of an abuse of discretion. We think that there was clearly no abuse of discretion in this but that the matter was one which it was entirely proper for the Board to consider; for it must not be forgotten that one of the purposes of the act is to encourage collective bargaining. See N.L.R.B. v. Botany Worsted Mills, 3 Cir., 133 F.2d 876, 880, certiorari denied 319 U.S. 751, 63 S.Ct. 1164, 87 L.Ed. 1705; N.L.R.B. v. Hearst Publications, 322 U.S. 111, 134, 64 S.Ct. 851, 88 L.Ed. 1170; May Department Stores v. N.L.R.B., 326 U.S. 376, 379, 380, 66 S.Ct. 203. In the case of N.L.R.B. v. Hearst Publications, supra, the Supreme Court laid down the rule applicable in the following language [322 U.S. 111, 64 S.Ct. 862]: "Wide variations in the forms of employee self-organization and the complexities of modern industrial organization make difficult the use of inflexible rules as the test of an appropriate unit. Congress was informed of the need for flexibility in shaping the unit to the par-

---

* N.L.R.B. v. Clarksburg Pub. Co., 4 Cir., 120 F.2d 976, 980; Pittsburgh Plate Glass Co. v. N.L.R.B., 3 Cir., 113 F.2d 698, 701, affirmed 313 U.S. 146, 155, 163, 61 S.Ct. 908, 85 L.Ed. 1251; N.L.R.B. v. Hearst Publications, 322 U.S. 111, 134, 64 S.Ct. 851, 88 L.Ed. 1170; May Department Stores v. N.L.R.B., 326 U.S. 376, 380, 66 S.Ct. 203.

ticular case and accordingly gave the Board wide discretion in the matter. Its choice of a unit is limited specifically only by the requirement that it be an 'employer unit, craft unit, plant unit, or subdivision thereof' and that the selection be made so as 'to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this Act.' Pittsburgh Plate Glass Co. v. National Labor Board, 313 U.S. 146, 61 S.Ct. 908, 912, 85 L.Ed. 1251. The flexibility which Congress thus permitted has characterized the Board's administration of the section and has led it to resort to a wide variety of factors in case-to-case determination of the appropriate unit. Among the considerations to which it has given weight is the extent of organization of the union requesting certification or collective bargaining. *This is done on the expressed theory that it is desirable in the determination of an appropriate unit to render collective bargaining of the company's employees an immediate possibility.* No plausible reason is suggested for withholding the benefits of the Act from those here seeking it until a group of geographically separated employees becomes interested in collective bargaining. In the circumstances disclosed by this record we cannot say the Board's conclusions are lacking in a 'rational basis.' "(Italics supplied).

In the case from which quotation is made, the employees included within the bargaining unit were organized newsboys within a city, suburban newsboys being excluded from the unit because not organized. The same principle would seem to be applicable to the two divisions of the bus company here, one of which favors and the other is opposed to organization. To adopt the company wide basis in determining the unit would be to defeat collective bargaining throughout the company's business; to adopt the divisional basis would be to secure collective bargaining in one division. Since the policy of the act is to further collective bargaining, it could not be an abuse of discretion on the part of the Board to determine the unit on a basis which would further rather than retard collective bargaining. And

quite aside from this, there is logical basis for the divisional unit in that this will make possible a relationship between the company and its employees most satisfactory to the greatest number; for the unit where a majority favor collective bargaining will have collective bargaining and the unit opposed to collective bargaining will not have it. It would be entirely possible that the employees of one division might join one union and the employees of the other a different union. In such case there would be no question as to the propriety of the adoption of the divisional basis. Cf. May Department Stores v. N.L.R.B., supra. There is no reason why the same principle should not be applied when in one division the majority belongs to a union and in the other does not.

In the May Department Stores case, supra [326 U.S. 376, 66 S.Ct. 206], there was evidence to show the appropriateness of a company wide unit in that all employees worked in the same building and were treated as a unit by management with reference to many matters. In that case the Board noted that a "larger unit might be more appropriate as self organization developed" but approved a smaller unit "so that collective bargaining might start for these employees without waiting until more employees might be organized into a larger unit". In approving this action the Supreme Court said: "Under section 9 (b) [29 U.S.C.A. § 159 (b)] the Board is delegated the authority to determine the unit. The judicial review afforded is not for the purpose of weighing the evidence upon which the Board acted and perhaps to overrule the exercise of its discretion but to 'guarantee against arbitrary action by the Board.' The Board had before it the business of the company, the numbers of employees, the treatment of all employees as a unit by management with reference to sick leave, hospitalization, employee privileges, vacations, et cetera. Evidence was presented that a large proportion of employees in the proposed unit were members of the same union. It had testimony as to similarity and dissimilarity in tailoring and altering between the men's and women's alteration rooms. There was evidence that

those who work on men's clothing, speaking generally, belong to a different union organization than those who work on women's clothes. The Board considered the interchange of workers between the two groups. We think that there was ample testimony to support the Board's conclusion that the employees of the two busheling rooms were an appropriate unit, since these employees had a degree of self-organization and a special trade which sufficiently differentiated them from other employees."

The company seeks to differentiate this decision on the ground that the employees thus recognized as an appropriate unit had a "special trade", which is not the case here. This special trade was of importance, however, merely in differentiating them from other employees. Here the employees of one division are clearly differentiated from those of the other, not only by the geographical difference of the territory embraced by the two divisions, but also by the fact that they had different seniority lists and were subject to different bus masters. If the company itself deals with the two groups through different bus masters, there should be no difficulty in allowing the two groups on their part to deal with the company differently. At all events this was a matter within the discretion of the Board, and we cannot say that the discretion was abused.

The order of the Board will be enforced. Order enforced.

SOPER, Circuit Judge (dissenting).

The Bus Company carries on its operation in two divisions known as the Virginia and North Carolina divisions. There is, however, a close association amongst the employees of the two divisions and a single management. Both divisions run into Virginia and both divisions run into North Carolina. The busses interchange between the two divisions. A large percentage of the bus operators in both divisions have the same headquarters, report at the same place and are constantly thrown together. Some of the operators live in Virginia and some in North Carolina, but about 40 per cent of the North Carolina operators and the majority of all of them in both divisions live in Norfolk. The qualifications are the same for both divisions. Joint meetings of the employees of both divisions are held to discuss safety methods and business rules and regulations, and the drivers mingle at the Norfolk terminal and at the garage. The discipline, employment and discharge of the operators of both divisions are handled through the office of the general manager. The books and records of the operations are not kept separately for the two divisions but for the business as a whole.

A majority of the employees in the Virginia division were in favor of the union, but the employees of the North Carolina division were opposed to union organization. Since it was therefore impossible to unionize the employees, if all of them in both divisions were included in a single bargaining unit, the Labor Board decided that the employees of the Virginia division, considered separately, constituted an appropriate unit for the purposes of collective bargaining. This is made quite clear by the Board's own words of explanation in giving its reasons for establishing the Virginia division as a separate bargaining unit. They were:

(1) "Each division, for example, has its own seniority list, so that if a driver transfers from one division to the other, he does not carry his seniority with him but goes to the bottom of the seniority list in his new division."

(2) "Each driver or conductor is definitely assigned to one division or the other and among regular drivers there is very infrequent interchange on a permanent basis; in case of emergency, a regular driver in one division may, on a purely voluntary basis, accept a run in the other division."

(3) "Further, each division is in charge of a separate bus master."

The Board, however, admitted that "there are other considerations which point up the equal propriety of a company wide unit." The Board could well have said that the other considerations were far more weighty, as will appear when listed in the Board's own words as follows:

(1) "Wages and working conditions are the same for employees throughout the system."

(2) "All busses are serviced at the same garage."

(3) "The dispatcher at Norfolk acts in his capacity for the two divisions."

(4) "General administration and employment policies are handled centrally."

Why then did the Board reject the normal and reasonable arrangement and set up the Virginia division as a separate unit? The answer is given by the Board in its own words as follows: "However, the Union has limited its organization activities to employees of the Virginia division since those in the North Carolina division have indicated their hostility to the Union and there is no present possibility of organizing the latter division. In view of the foregoing, and in the absence of any bargaining history, we are of the opinion that at this time a unit confined to employees of the Virginia division is appropriate."

Section 9(b) of the statute gives the Board the power to determine in each case the unit appropriate for purposes of collective bargaining to effectuate the policies of the Act; but the Act does not permit the Board to limit a bargaining unit to a certain size simply to enable the union to secure an organization in a plant which would otherwise be impossible. It is true that the preamble of the statute declares that it is the policy of the United States to encourage the practice and procedure of collective bargaining and to protect the exercise by the workers of the full freedom of self organization and the designation of representatives of their own choosing for the purpose of negotiating the terms and conditions of their employment. But Section 9 (a) provides that the bargaining representatives shall be designated by the *majority of the employees* in an appropriate unit and that they shall be the exclusive representatives of the employees for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment.

We need nothing further than these provisions to show that the unit must be one which is appropriate for bargaining in respect to wages and other conditions of employment. In this case, as the Board has found, the wages and working conditions in both divisions are the same and the problems of administration are handled by the company as a whole; and the real reason for setting up the Virginia division as a separate unit was not that it is an appropriate unit for bargaining purposes, but *solely to* establish the union in the business against the will of the majority of the employees. What is the inevitable result? It is that the representatives of a minority will have the authority to bargain for the whole body of employees. This is true because it will be obviously impossible for the company to make any distinction between the bus operators in the two divisions since they have the same qualifications, are closely associated in the performance of their duties, and are subjected to the same conditions of labor.

No decision of the Supreme Court has ratified the establishment of a bargaining unit composed of a minority of employees where all employees are subject to the same qualification and working conditions.