**METROPOLITAN LIFE INSURANCE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 14390.

United States Court of Appeals Third Circuit.

Argued Oct. 15, 1963.

Decided Feb. 18, 1964.

Warren M. Davison, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Lee M. Modjeska, Attys., N. L. R. B., Washington, D. C., for respondent.

Isaac N. Groner, Washington, D. C., amicus curiae, Insurance Workers International Union, AFL-CIO.

Before McLAUGHLIN, HASTIE and FORMAN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This case is before the court upon the petition of the Metropolitan Life Insurance Company (Metropolitan) to review and set aside an order of the National Labor Relations Board (Board) issued against Metropolitan on March 11, 1963, pursuant to Section 10(e) of the National Labor Relations Act, as amended. 29 U.S.C. § 151 et seq. (1958). In its answer the Board has requested that its order be enforced in full.

Metropolitan is a New York corporation, engaged in the sale and issuance of insurance policies throughout the United States and Canada. Its operations are highly centralized and the practices and procedures established at the New York home office govern the district offices, which are the basic operating units of the company. A superintendent of agencies oversees the district offices in his territory, while each district office is under the supervision of a manager. The district offices themselves are relatively independent of each other, except in so far as they are joined by the company into a territory. There is virtually no interchange of agents among the various district offices, and there is no business or social contact among agents except on the individual district office level.

Delaware is part of Metropolitan's Atlantic Coast Territory with three district offices. Two are in the Wilmington area, called Brandywine and Kirkwood, and the third is forty-six miles from Wilmington in Dover. These offices account for fifty-four regular (in the field) agents and four office account agents. Brandywine

Burton A. Zorn, New York City, Owen B. Rhoads, Philadelphia, Pa., George G. Gallantz, Marvin Dicker, Thomas F. Delaney, Associate Gen. Counsel, New York City, for petitioner; Dechert, Price & Rhoads, Philadelphia, Pa., Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel.

has eighteen, Kirkwood nineteen, and Dover seventeen.

It was within this organizational structure, the Insurance Workers' International Union, AFL-CIO (Union) sought to organize Metropolitan's insurance agents in Delaware. Apparently failing in its attempt to organize the agents of the three district offices, the Union petitioned the Board, pursuant to § 9(c) of the Act, requesting certification as bargaining representative of the agents at the two Wilmington district offices. The Board decided that the grouping of these two offices was an appropriate unit for collective bargaining and directed an election to be held. The Metropolitan Life Insurance Company, 138 N.L.R.B. 565 (1962). The Union won and on October 15, 1962 the Board certified the Union as the representative.

Upon Metropolitan's refusal to bargain, the Board found that Metropolitan was guilty of an unfair labor practice within the meaning of Section 8(a) (5) and Section 8(a) (1) of the Act. Metropolitan Life Insurance Company, 141 N.L.R.B. No. 37 (1963). Metropolitan has admitted that it refused to bargain but has argued consistently below and here, that the grouping of the Brandywine and Kirkwood district offices, is not an appropriate unit, that the Board's unit determination is based on the Union's extent of organization contrary to § 9(c) (5) of the Act.

■ By virtue of Section 9(b) of the National Labor Relations Act (Wagner Act), Congress has given the Board the authority to determine units appropriate for purposes of collective bargaining. 29 U.S.C. § 159(b) (1958), as amended. The Taft-Hartley Amendments have not altered this and the determination of an appropriate unit remains one left to the wide and informed discretion of the Board. Its decision, if not final, is rarely to be disturbed. Packard Motor Car Company v. N. L. R. B., 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); Texas Pipe Line Company v. N. L. R. B., 296 F.2d 208, 210 (5 Cir. 1961); Foreman & Clark, Inc. v. N. L. R. B., 215 F.2d 396, 405 (9 Cir. 1954). See N. L. R. B. v. Pittsburgh Plate Glass Co., 270 F.2d 167, 173 (4 Cir. 1959); N. L. R. B. v. J. W. Rex Co., 243 F.2d 356, 359 (3 Cir. 1957); Westinghouse Electric Corp. v. N. L. R. B., 236 F.2d 939, 942 (3 Cir. 1956); N. L. R. B. v. Botany Worsted Mills, 133 F.2d 876, 880 (3 Cir. 1943). However, the 1947 amendments, by the addition of certain sections and provisos to the Act, limited the discretion of the Board in determining appropriate units. This appeal is focused on Section 9(c) (5),[1] one such limiting section and the issue to be determined here is whether in the exercise of its said discretion, the Board went afoul of the Congressional mandate that in determining appropriate units, the extent to which the employees have organized shall not be controlling.

Early in its life, the Board had developed the so-called "Extent of organization" theory. This theory, quickly endorsed by the courts,[2] gave expression

1. Section 9 "(a) * * *
    "(b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: * * *
        "(c) (1) * * *
            "(2) * * *
            "(3) * * *
            "(4) * * *
    .  "(5) In determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent

to which the employees have organized shall not be controlling."

2. N. L. R. B. v. Hearst Publications, 322 U.S. 111, 134, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), citing Matter of Gulf Oil Co., 4 N.L.R.B. 133, 137 (1937); May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145 (1945) endorsing the view of the Board in 50 N.L.R.B. 669, 672 (1943); N. L. R. B. v. Norfolk Southern Bus Corp., 159 F.2d 516, 520 (4 Cir. 1947); N. L. R. B. v. Botany Worsted Mills, 133 F.2d 876 (3 Cir. 1943), endorsing the appropriate unit in 27 N.L.R.B. 687, 690

to the view that it was desirable in the determination of an appropriate unit to render collective bargaining of employees an immediate or reasonably early possibility. The Board regarded this view as an obedient implementation of the command of the National Labor Relations Act that it seek to "insure to employees the full benefit of their right to self-organization and to collective bargaining and otherwise to effectuate the policies of this act." [3] However, as the theory was brought to bear on Board determinations of appropriate units, it became clear that in certain instances, the extent of employee organization was given controlling weight. See Matter of Chase Brass & Copper Co., Inc., 4 N.L.R.B. 47, 51 (1937); New England Spun Silk Corp., 11 N.L.R.B. 852 (1939); Matter of Botany Worsted Mills, 27 N.L.R.B. 687 (1940), with which Board determination we did not interfere. N. L. R. B. v. Botany Worsted Mills, 133 F.2d 876 (3 Cir. 1943); J. L. Hudson Co., 56 N.L.R.B. 406 (1944).

These decisions and others [4] attest to the strong, if not overwelming reliance the Board, from time to time, placed on the factor of the union's extent of organization. It was this approach Congress sought to block.

Representative Fred A. Hartley, presenting the House Report on its bill to amend the National Labor Relations Act said in regard to what was to become 9(c) (5):

"Section 9(e) (3) strikes at a practice of the Board by which it has set up as units appropriate for bargaining whatever group or groups the petitioning union has organized at the time. Sometimes, but not always, the Board pretends to find reasons other than the extent to which the employees have organized as ground for holding such units to be appropriate. [Matter of New England Spun Silk Co., 11 N.L.R.B. 852 (1939); Matter of Botany Worsted Mills, 27 N.L.R.B. 687 (1940).] While the Board may take into consideration the extent to which employees have organized, this evidence should have little weight, and as section 9(e) (3) provides, is not to be controlling." 1 Leg.Hist. 328.[5]

Senator Robert Taft, after the bill had passed the first time (the Senate and House later had to vote to override President Truman's veto), submitted a supplementary analysis of the Labor Bill as passed "in order to make clear the legislative intent." As to § 9(c) (5), Senator Taft said:

"It overrules the 'extent of organization' theory sometimes used by the Board in determining appropriate units. Opponents of the bill have stated that it prevents the establishment of small operational units and effectively prevents organization of

(1940); See also Matter of R.C.A. Communications, Inc., 2 N.L.R.B. 1109, 1115 (1937); Gulf Oil Co., 4 N.L.R.B. 133 (1937); New England Spun Silk Corporation, et al, 11 N.L.R.B. 852, 855 (1939); Gastonia Weaving Co., Inc., 49 N.L.R.B. 342, 344 (1943); J. L. Hudson Co., 56 N.L.R.B. 406, 408 (1944); Armour and Co., 63 N.L.R.B. 1214, 1216–1217 (1945); Wells-Gardner & Co., 71 N.L.R.B., 176, 178 (1946).

3. Under the National Labor Relations Act before the 1947 amendments, 9(b) provided;
"The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-

organization and to collective bargaining, and otherwise to effectuate the policies of this act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit or subdivision thereof."
The changed phraseology in Section 9 (b) (see footnote 1) did not change its substance and the pre-1947 considerations are written into the Taft-Hartley version of the section. See 13 N.L.R.B. Ann.Rep. 36 (1948); National Tube Company, 76 N.L.R.B. 1199, 1203 (1948).

4. See footnote 2.

5. Leg.Hist. denotes the two volume work Legislative History of the Labor Management Relations Act, 1947 (G.P.O. 1948).

public utilities, insurance companies and other business whose operations are widespread. It is sufficient answer to say that the Board has evolved numerous tests to determine appropriate units, such as community of interest of employees involved, extent of common supervision, interchange of employees, geographical considerations, etc., any one of which may justify the finding of a small unit. The extent of organization theory has been used where all valid tests fail to give the union what it desires and represents a surrender by the Board of its duty to determine appropriate units. Its use has been particularly bad where another union comes in and organizes the remainder of the unit which results in the establishment of two inappropriate units."
2 Leg.Hist. 1625.

Simultaneous with the hearings and debates in Congress regarding the proposed amendments to the National Labor Relations Act, the Board was confronted with a series of representation petitions [6] of which Garden State Hosiery Co., 74 N.L.R.B. 318 (1947) is most informative. For the first time the Board entered upon an extended discussion of the significance of the extent of organization theory in its consideration of an appropriate unit.

In Garden State Hosiery Co., 74 N.L.R.B. 318, 322–323 (1947), the Board said:

"Extent of existing organization can never be the sole criterion, nor is it often the controlling one. The Board has always insisted on the coexistence of certain other facts that es-tablish the feasibility of bargaining on the basis of the smaller unit. Additional objective factors must be present in order to rule out the possibility that the petitioning union might unrestrictedly manipulate the boundaries of the appropriate unit. Thus, not only must bargaining on a more comprehensive basis be improbable in the near future but, as a wholly separate matter, the unit sought must itself be homogeneous, identifiable and distinct. Indeed the Board has consistently refused to set apart as an appropriate unit any subdivision or group of employees the nature or situs of whose work is indistinguishable from that of other employees, or whose work is not functionally coherent and differentiated, despite the contention of a petitioning union to the contrary. Petitions which lack objective support are regularly dismissed, despite union's attempts to invoke the extent of organization theory."

See also Hudson Hosiery Company, 74 N.L.R.B. 250, 252 (1947). One such objective factor of which the Board speaks springs from the statute itself. The unit proposed must be an "employer unit, craft unit, plant unit, or subdivision thereof." 29 U.S.C. § 159(b) (1958); Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); N. L. R. B. v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). Other factors born of the expertise of the Board and used to determine appropriate units have been: whether the proposed unit is homogeneous, identifiable, and distinct; [7]

6. Chadbourne Hosiery Mills, Inc., 74 N.L.R.B. 333 (1947); Jacoby-Bender, Inc., 74 N.L.R.B. 337 (1947); Asheboro Hosiery Mills, Inc., 74 N.L.R.B. 341 (1947); Waldensian Hosiery Mills, Inc., 74 N.L.R.B. 315 (1947); Hudson Hosiery Company, 74 N.L.R.B. 250 (1947). All of these cases were decided on the same day, June 20, 1947, after the labor bill had passed the Senate and the House for the first time. On June 20, 1947,

President Truman sent his message to Congress vetoing the Taft-Hartley Amendments.

7. See Garden State Hosiery, 74 N.L.R.B. 318 (1947); Rothschild-Kaufman Co., Inc., 98 N.L.R.B., 353 (1952); N. L. R. B. v. Convair Pomona, 286 F.2d 691, 696 (9 Cir. 1961); N. L. R. B. v. Glen Raven Knitting Mills, 235 F.2d 413 (4 Cir. 1956); N. L. R. B. v. Moss Amber Mfg. Co., 264 F.2d 107 (9 Cir. 1959);

its previous history of bargaining;[8] whether there is a community of interest among the employees;[9] geographical proximity;[10] the relationship between the proposed unit and the organization of the employer's business;[11] and the similarity of jobs and functions.[12]

■ Applying these factors, the Board could determine any number of appropriate units, comprising a given set of employees.[13] However, the question before the Board will of necessity be whether the proposed unit is appropriate, and in making that decision, Congress has now said, "the extent to which the employees have organized shall not be controlling." With all this in mind, we believe the effect of 9(c) (5) is to require the Board to determine whether a unit is in and of itself appropriate, apart from the extent to which

David Max & Co., 109 N.L.R.B. 1308 (1954). In determining "identity" or "distinct" character, whether there was an interchange of employees would be important.

8. See International Association of Tool Craftsmen v. Leedom, 107 U.S.App.D.C. 268, 276 F.2d 514 (D.C.Cir.1960) where the court at p. 516 referred to this factor considered by the Board, because it is some evidence of a natural grouping.

9. Texas Pipe Line Company v. N. L. R. B., 296 F.2d 208 (5 Cir. 1961); N. L. R. B. v. Armour & Co., 154 F.2d 570, 169 A.L.R. 421 (10 Cir. 1946); Foreman & Clark, Inc. v. N. L. R. B., 215 F.2d 396 (9 Cir. 1954): There, 215 F.2d at p. 406, the court spoke of "a cohesive group, allied as to their bargaining interests by the similarity of their functions and working conditions"; 13 N.L.R.B.Ann. Rep. 35 (1948); said the Board in Montgomery Ward & Co., 114 N.L.R.B. 1155 (1955): In establishing and describing appropriate units, the Board "strives to give meaning and practical effect to the actual day-to-day relationships among employees. The Board's aim is best served by giving controlling effect to the community of interest existing among employees * * *."

10. Texas Pipe Line Company v. N. L. R. B., 296 F.2d 208 (5 Cir. 1961); N. L. R. B. v. West Kentucky Coal Co., 152 F. 2d 198, 202 (6 Cir. 1945); N. L. R. B. v. Smythe, 212 F.2d 664 (5 Cir. 1954); N. L. R. B. v. Smith, 209 F.2d 905, 907 (9 Cir. 1954); N. L. R. B. v. Moss Amber Mfg. Co., 264 F.2d 107 (9 Cir. 1959); Great A. & P. Tea Company, 128 N.L.R.B. 342, 343–344 (1960); Jackson Jitney Jungle Stores, Inc., 115 N.L.R.B. 374, 375 (1956); B. G. Wholesale, Inc., 114 N.L.R.B., 1429, 1430–1431 (1955); Buitoni Foods, Inc., 111 N.L.R.B. 638, 639 (1955).

11. See Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941).

12. Texas Pipe Line Company v. N. L. R. B., 296 F.2d 208 (5 Cir. 1961); N. L. R. B. v. Smythe, 212 F.2d 664 (5 Cir. 1954). See generally: Mountain States Telephone & Telegraph Co. v. N. L. R. B., 310 F.2d 478 (10 Cir. 1962); 1 N.L.R.B. Ann.Rep. 112–20 (1936); Magruder, A Half-Century of Legal Influence Upon the Development of Collective Bargaining, 50 Harv.L.Rev. 1071, 1106 (1937); 12 N.L.R.B.Ann.Rep. 20–21 (1947); 11 N.L.R.B.Ann.Rep. 24 (1946); Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 153, 61 S.Ct. 908, 85 L.Ed. 1251 (1941). See 27 Fordham L.Rev. 218, 220 (1958). Note also the test devised for determination of an appropriate employer unit; resolving the issue of whether two closely related businesses constitute an appropriate single bargaining unit: present unity of interest, common control, dependent operation, sameness of character of work and unity of labor relations between the separate entities involved. N. L. R. B. v. Gibraltar Industries, Inc., 307 F.2d 428 (4 Cir. 1962); N. L. R. B. v. Jones Sausage Co., 257 F.2d 878 (4 Cir. 1958); N. L. R. B. v. Williams, 195 F.2d 669 (4 Cir. 1952).

13. The Board has said "There is nothing in the statute which requires that the unit for bargaining be the *only* appropriate unit, or *ultimate* unit, or the *most* appropriate unit; the Act requires only that the unit be 'appropriate'. It *must* be appropriate to ensure to employees, *in each case,* 'the fullest freedom in exercising the rights guaranteed by this Act.'" Morand Brothers Beverage Co., 91 N.L.R.B. 409, 418 (1950); see also Garden State Hosiery, 74 N.L.R.B., 318, 324 (1947); Mueller Brass Co. v. N. L. R. B., 86 U.S.App.D.C. 153, 180 F.2d 402 (D.C.Cir.1950); N. L. R. B. v. Smith, 209 F.2d 905, 907 (9 Cir. 1954).

the employees are organized.[14] Whether the employees were controlled by the extent of their organization when they petitioned the Board is not the issue. Rather, it is whether the Board in determining a unit's appropriateness was so controlled.[15]

The extent to which the Union failed to organize should not determine the appropriateness of the group it did organize. To hold, that because the Union failed to organize on a broader basis, the smaller unit petitioned for is inappropriate, would be to penalize the Union for failing in an attempt to organize, which right is fundamental to the Act. We are therefore, of the same mind as Member Fanning, who in his special concurrence in Life Insurance Company of Virginia, 123 N.L.R.B. 610, 614 (1959), said:

> "Labor organizations are in the business of organizing employees, and it is not fanciful to assume that they desire to organize all the employees they can, or at least, all employees in certain job classifications.
>
> "That the Board has heretofore given a reasonable interpretation to the extent of organization provision 9(c) (5) is evident in prior decisions where, for example, the Board has held that the fact that a labor organization may have unsuccessfully attempted to organize on a broader basis does not render the

smaller unit sought inappropriate when the smaller unit is otherwise appropriate. (See Whittaker Controls Division of Telecomputing Corporation (Lynwood Plant), 122 N.L.R.B. 624 (1958); Berger Brothers Company, 116 N.L.R.B. 439 (1956))."

■ Our interpretation of 9(c) (5) is not in conflict with our decision in Westinghouse Electric Corp., 236 F.2d 939 (3 Cir. 1956) or the view of other circuits in Quaker City Life Insurance Company v. N. L. R. B., 319 F.2d 690 (4 Cir. 1963); Foreman & Clark, Inc. v. N. L. R. B., 215 F.2d 396 (9 Cir. 1954); N. L. R. B. v. Moss Amber Manufacturing Co., 264 F.2d 107 (9 Cir. 1959); Harris Langenberg Hat Co. v. N. L. R. B., 216 F.2d 146 (8 Cir. 1954); N. L. R. B. v. Smythe, 212 F.2d 664 (5 Cir. 1954), which proposes that the extent of organization may be a factor although not the controlling one, as long as other valid tests indicate the unit is appropriate. This view is also sensitive to the legislative purpose of 9(c) (5). Of the many factors employed by the Board in determining appropriate units, Congress limited only the extent of union organization. On the other hand, Senator Taft specifically referred to the others, some of which we enumerated above, which could be properly employed by the Board. See statement of Senator Taft, supra. Further, consistent with our

14. The extent of organization is not excluded as a factor. Section 9(c) (5) permits it to be a contributing, but not a controlling factor. However, while this is what the section says, what it effects is to require the Board to discover a unit's appropriateness, apart from the extent of employee organization. The Board may regard the extent to which the employees are organized as having inherent evidentiary value, in the same way as prior history of bargaining (see footnote 8), but this should not control its determination.

15. In this we differ with the interpretation of 9(c) (5) in N. L. R. B. v. Glen Raven Knitting Mills, 235 F.2d 413 (4 Cir. 1956) and N. L. R. B. v. Morganton Full Fashioned Hosiery Co., 241 F.2d 913 (4

Cir. 1957). In Glen Raven there was evidence that the Union failed to organize on a broader basis and sought a smaller unit which it had successfully organized and which the Board approved as appropriate. The court overturned the Board. Its rationale as described in Morganton 241 F.2d at p. 915 was: "Clearly the union was controlled by the extent of its organization, and when the Board, with full knowledge of the facts, gave its approval, it failed to observe the provisions of the statute, * * *." However, Judge Boreman in his dissent in N. L. R. B. v. Quaker City Life Insurance Co., 319 F.2d 690 (4 Cir. 1963) hinted that the majority approach in the Quaker City case was in effect overruling Glen Raven and Morganton.

holding here, is the Board's interpretation of 9(c) (5) which, while not binding on this court, is entitled to weight. Since the amendment, the Board has looked to factors other than extent of organization in determining appropriate units.[16] See particularly Waldensian Hosiery Mills, Inc., 83 N.L.R.B. 742, 744 (1949). Of course, the various factors and policies the Board will follow in determining appropriate units will depend in great part on the type of unit proposed, whether it be residual, departmental, single plant, multi-plant or multi-employer, and on the type of industry involved. But whatever the kind of unit, the extent to which the employees are organized cannot be controlling.

This review is also focused on the insurance industry and the organization of insurance agents regarding which, for many years, a special rule was promulgated by the Board. In 1944, the Board adopted the policy that it would avoid certifying bargaining units of insurance agents less than state or company-wide in scope. Metropolitan Life Insurance Co., 56 N.L.R.B. 1635 (1944). This policy had not apparently been tested by the courts since the Taft-Hartley Amendments. But see Prudential Life Insurance Co., 56 N.L.R.B., 1859 (1944) affirmed 154 F.2d 385 (6 Cir. 1946). In Metropolitan (1944), the Board said at p. 1639:

"Organization among insurance agents is comparatively recent, but is steadily growing. The tendency of such organization is toward state-wide units * * *. Thus, the rapid growth of union organization among insurance agents makes it clearly appear that provisional units less than state-wide in scope are, under ordinary circumstances, unnecessary to make collective bargaining reasonably possible for them, if they desire it. Accordingly, we are of the opinion that, in the absences of unusual circumstances, the practice of setting up units for insurance agents smaller than state-wide in scope should be avoided."

This thinking guided the Board's determinations for seventeen years until Quaker City Life Insurance Company, 134 N.L.R.B. 960 (1961).[17] In Quaker City, the Board, with two members dissenting, found appropriate a unit consisting of employees of a single district office. The Fourth Circuit upheld the decision of the Board. N. L. R. B. v. Quaker City Life Insurance Co., 319 F.2d 690 (4 Cir. 1963). The Board held, at page 962, that the Metropolitan rule was:

" * * * adopted *solely* in anticipation of broader organization on a company-wide or state-wide basis, which at that time appeared imminent. As a practical matter, however, such state-wide or company-wide organization has not materialized, and the result of the rule has been to arrest the organizational development of insurance agents to an extent certainly never contemplated by the Act, or for that matter, by the Board, that decided the Metropolitan Life case. There is no longer any rational basis for applying different rules of organization

16. Life Insurance Co. of Virginia, 143 N.L.R.B. No. 128 (1963); Singer Sewing Machine Co., 140 N.L.R.B. 1061, 1064 (1963); Sav-on Drugs, Inc., 138 N.L.R.B. 1032, 1035 (1962); Transcontinental Bus System, Inc., 119 N.L.R.B. 1840, 1844 (1958); See also Berger Brothers Co., 116 N.L.R.B. 439, 441 (1956); J. I. Case Company, 87 N.L.R.B. 692 (1949).

17. See inter alia; John Hancock Mutual Life Insurance Company, 57 N.L.R.B. 700 (1944); Prudential Insurance Company of America, 61 N.L.R.B. 1289 (1945); Quaker City Life Insurance Company, 73 N.L.R.B. 177 (1947); Monumental Life Insurance Company, 75 N.L.R.B. 776 (1948); Home Beneficial Life Insurance Company, 89 N.L.R.B. 392 (1950); United Insurance Company, 108 N.L.R.B. 843 (1954); The Life Insurance Company of Virginia, 123 N.L.R.B. 610 (1959); but see Prudential Life Insurance Company, 56 N.L.R.B. 1859 (1944) affirmed 154 F.2d 385 (6 Cir. 1946).

to the insurance industry, than are applied to other industries. The rule was adopted for the purpose of permitting organization on a state-wide or employer-wide basis, which did not develop as anticipated. Contrary to our dissenting colleagues, we regard this as a valid reason for changing the rule. Obviously, when the purpose for which a rule has been established fails, the rule should also fail. This is especially so with respect to a rule which unfairly prejudices the collective bargaining rights of employees. Accordingly, in the future, the Board's policy will be not to preclude the organization of insurance agents into units of less than employer-wide or state-wide scope, and we shall apply our normal unit principles to the cases as they arise."

Since Quaker City, pursuant to its new policy, the Board has found as appropriate: a unit composed of district offices in the Cleveland area: Metropolitan Life Insurance Company, 138 N.L.R.B. 512 (1962), Equitable Life Insurance Company, 138 N.L.R.B. 529 (1962); two individual units, one at the McKeesport, Pennsylvania, District office and another at the Wilkinsburg, Pennsylvania, District office: Western and Southern Life Insurance Company, 138 N.L.R.B. 538 (1962); a unit composed of employees at the Sioux City, Iowa, Sioux Falls, South Dakota, and Fargo, North Dakota, district offices because the offices were administratively controlled by the Sioux City district office: Metropolitan Life Insurance Company, 138 N.L.R.B., 734 (1962); a unit comprising the employees of the Chicago district offices: Metropolitan Life Insurance Co., 144 N.L.R.B. No. 15 (1963); a unit composed of the employees in a single district office: Life Insurance Company of Virginia, 53 L.R.R.M., 1515 (1963); and it was pursuant to its new policy that, the Board in this case found that the employees of the two district offices in the Wilmington area constituted an appropriate unit. Metropolitan Life Insurance Company, 138 N.L.R.B. 565 (1962).

■ First of all, there can be no question that it was within the authority of the Board to change its rule, if in so doing, it did not act arbitrarily or unreasonable or in violation of the Act. SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1946); N. L. R. B. v. National Container Corp., 211 F.2d 525 (2 Cir. 1954); Optical Workers' Union v. N. L. R. B., 227 F.2d 687 (5 Cir. 1955); N. L. R. B. v. Pittsburgh Plate Glass Co., 270 F.2d 167, 174 (4 Cir. 1959). Metropolitan, however, argues that the change in policy represented a return to the extent of organization theory of choosing appropriate units, in violation of 9(c) (5). Metropolitan misreads the Board's reasons in Quaker City for the change in policy. It was the Board's informed view that the 1944 Metropolitan rule "unfairly prejudiced the collective bargaining rights of employees." There is a vast difference between taking away an obstacle to wider union organization and collective bargaining which is the explicit legislative purpose and mandate of the Act, and determining appropriate units on the basis of employee organization. Conversely, however, [though the point is now moot and we do not decide it] the Metropolitan state-wide rule seemed itself born of the extent of organization theory. Metropolitan Life Insurance Company, 56 N.L.R.B. 1635 (1944); Quaker City Life Insurance Company, 73 N.L.R.B. 177 (1947); Prudential Life Insurance Company, 61 N.L.R.B. 1289, 1292 (1945); Life Insurance Company of Virginia, 123 N.L.R.B. 610 (1959), see special concurring opinion of Member Fanning at p. 614.

■ The Board here decided on the entire record before it that " * * * all agents are subject to the same wage policies, employee benefits and working conditions. * * * There is virtually no interchange or transfer of agents among the various district offices and there is no business or social contact among the agents except on the individual district office level. There is no history of collective bargaining affecting

the employees involved in the instant proceedings. \* \* \* [T]he individual district office is in effect a separate administrative entity through which the Employer conducts its business operation, and therefore, is inherently appropriate for purposes of collective bargaining. \* \* \* [T]his finding does not preclude the grouping of such offices where such grouping is justified by cogent geographic considerations." Metropolitan Life Insurance Company, 138 N.L.R.B. 565, 567 (1962). For these reasons, the Board concluded that the agents of Metropolitan in the two Wilmington districts were an appropriate unit for collective bargaining. We believe the Board's determination was within its informed discretion consonant with Section 9(b) and not in violation of 9(c) (5) of the Act. As we noted above, the Union may be controlled by the extent of its organization so long as the Board is not so controlled, i. e., the certified appropriate unit must be in and of itself appropriate apart from the extent of employee organization. Metropolitan has contended that a state-wide territorial or company-wide unit is the appropriate unit. The Board might so declare such a unit appropriate, for, as the Board has said, there may be several kinds of appropriate units involving a given group of employees. The question should be and is in this instance whether the proposed unit is appropriate, in deciding which the Board has applied, it appears, the same criteria as it has to other industries and retail establishments. See Life Insurance Company of Virginia, 123 N.L.R.B. 610, 614 (1959); Quaker City Life Insurance Company, 134 N.L.R.B. 960, 962 (1961). See Donnelly, New National Labor Relations Board Criteria for the Organization of Insurance Agents, 1962 Insurance Law Journal 175 (1962). The criteria or factors considered for a single district office unit and for a unit comprising several district offices will differ in the same way as they differ somewhat in single plant and multi-plant determinations.[18] Thus while a single district office may be an appropriate unit, a grouping of two may not be, in the same general area where there are three district offices. If the same reasons which form the basis for a grouping of two, also apply to a grouping of three, the grouping of two may be inappropriate, because either arbitrary or in violation of 9(c) (5). See N. L. R. B. v. Convair Pomona, 286 F.2d 691 (9 Cir. 1961). That kind of claim made by Metropolitan here is readily refuted. The grouping of the two district offices was founded in part on cogent geographical considerations. The third district office not included was forty-six miles from Wilmington.

On a petition for enforcement, where there is a claim of gerrymandering or of a violation of 9(c) (5), the court, inter alia, in its study of the record will have that specifically in mind. See dissent in Equitable Life Insurance Company, 138 N.L.R.B. 529 (1962); see also the dissent in Garden State Hosiery, 74 N.L.R.B. 318, 326 (1947). We mention this because of the position taken by Metropolitan that the Board in this action and in others used simulated bases for its decisions which were in reality controlled by the union's extent of organization. Petitioner draws a long bow in that charge which is not borne out by the record. Our own close examination of the latter has satisfied us that the grounds upon which the Board rendered its determination are not unreasonable and are supported by substantial evidence on the whole case.

The petition for review will be denied. The order of the Board will be enforced. A proposed form of decree may be submitted.

18. For factors used to determine multiplant units, see Continental Baking Company, 99 N.L.R.B. 777 (1952); Father & Son Shoe Stores, Inc., 117 N.L.R.B. 1479 (1957) cited in Life Insurance Co. of Virginia, 123 N.L.R.B. 610 (1959) special concurrence of Member Fanning at p. 614; 16 N.L.R.B.Ann.Rep. 98–102 (1951); 15 N.L.R.B.Ann.Rep. (1950).