# MUELLER BRASS CO. v. NATIONAL LABOR RELATIONS BOARD.

## No. 10230.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 20, 1949.

Decided Feb. 13, 1950.

Mr. Gerald D. Reilly, Washington, D. C., for petitioner.

Mr. William Feldesman, Assistant General Counsel, National Labor Relations Board, Washington, D. C., of the Bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. A. Norman Somers, Assistant General Counsel, National Labor Relations Board, Washington, D. C., was on the brief, for respondent. Mrs. Rose Mary Filipowicz, Washington, D. C., also entered an appearance for respondent.

Before PROCTOR, FAHY and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

In January 1948, the International Die Sinkers Conference requested the Mueller Brass Company to recognize it as the bargaining representative of an employee unit composed of fourteen journeymen die sinkers and two die sinker apprentices. These die sinkers are among 149 employees in the toolroom of the Company's service department, which has a total of 370 employees.[1] Prior to their request for separate representation, the die sinkers had always been part of a larger unit. Thus, from 1933 to 1939, both service and production departments, over 3,000 employees in all, comprised a single plant-wide bargaining unit. Although production and service departments were separated in 1939, the die sinkers remained within the service unit which was thereafter represented by the International Association of Machinists.[2]

Upon the Company's refusal to recognize their request for separate representation, the Die Sinkers Union initiated representation proceedings[3] and, on August 18, 1948, a majority of the Board found

---

1. The Company manufactures fittings, tubing, valves, copper piping and miscellaneous brass and copper products. Employees of the service department are engaged in the manufacture, maintenance and repair of tools, dies and jigs.

2. For convenience, the Port Huron, Michigan, Lodge of the International Die Sinkers Conference will hereinafter be referred to as the "Die Sinkers Union";

the Mueller Brass Company, as the "Company"; the fourteen journeyman die sinkers and two die sinker apprentices, as the "die sinkers"; and the International Association of Machinists, as the "Machinists Union."

3. In 1946, the Board's Regional Director administratively dismissed a similar petition by the die sinkers.

that the die sinkers might constitute an appropriate unit. Final determination, however, was deferred until an election could be held to enable the die sinkers to choose between the Die Sinkers Union and the Machinists Union, which was the then existing broader unit. The Die Sinkers Union received a unanimous vote and, on October 13, 1948, was certified by the Board as the representative of the die sinkers. Nevertheless, the Company continued its refusal to bargain. A charge of unfair labor practice followed and the Board found that the Company had violated Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act, as amended by the Labor-Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. §§ 158(a) (1), 158(a) (5)[4]. Review of the Board's cease and desist order is sought by the Company under Section 10(f) of the 1947 Act, 29 U.S.C.A. § 160(f), on the ground that this particular employee unit does not constitute an "appropriate bargaining unit" within the meaning of Section 9(b), 29 U.S.C.A. § 159(b).

██ Section 9(b)[5] contains a broad grant of authority to the Board to determine in each case whether the "appropriate" unit is "the employer unit, craft unit, plant unit, or subdivision thereof" and whether the unit selected will satisfactorily effectu-ate the controlling policies of the Act, i. e., the right to self-organization and to collective bargaining. Such determination is binding upon us unless the Board has acted arbitrarily or capriciously.[6] No other course is practicable in a complex industrial society where organizational patterns differ from industry to industry and plant to plant. Congress recognized, in both the National Labor Relations Act of 1935 and the Labor-Management Relations Act of 1947, that an appropriate bargaining unit can hardly be ascertained by means of some neat statutory formula and, therefore, decided to furnish only minimal standards to guide the Board.[7] This broad discretion is based upon the position of the Board as an agency equipped to make the factual investigations and informed inferences from the record which are essential to a proper determination.

Although Congress carefully scrutinized the unit-selection problem in 1947, and made some changes designed to encourage crafts, it apparently intended to restate then existing law with regard to discretion in determining the "appropriate" unit. Thus, the Senate Report reads: "Our bill still leaves to the Board discretion to review all the facts in determining the appropriate unit, but it may not decide that any craft unit is inappropriate on the ground

---

4. The findings of fact, conclusions of law, and order of the Board in the unfair labor practice proceeding are reported at 82 N. L. R. B. 449 (1949).

5. The pertinent part of Section 9(b), 29 U.S.C.A. § 159(b), reads: "The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, That the Board shall not * * * (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation * * *."

6. May Dept. Stores Co. v. N. L. R. B., 1945, 326 U.S. 376, 380, 66 S.Ct. 203,
90 L.Ed. 145; N. L. R. B. v. Hearst Publications, 1944, 322 U.S. 111, 134, 64 S.Ct. 851, 88 L.Ed. 1170; Pittsburgh Plate Glass Co. v. N. L. R. B., 1941, 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251; Allis-Chalmers Mfg. Co. v. N. L. R. B., 7 Cir., 1947, 162 F.2d 435, 439; Marlin-Rockwell Corp. v. N. L. R. B., 2 Cir., 1941, 116 F.2d 586, 587; Bussmann Mfg. Co. v. N. L. R. B., 8 Cir., 1940, 111 F.2d 783, 785; International Ass'n of Machinists v. N. L. R. B., 1939, 71 App.D.C. 175, 192, 110 F.2d 29, 46, affirmed 1940, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50.

See Packard Motor Car Co. v. N. L. R. B., 1947, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040; N. L. R. B. v. Hearst Publications, 1944, 322 U.S. 111, 134, 64 S.Ct. 851, 88 L.Ed. 1170. The Board has, of course, worked out more detailed criteria of its own. See, e.g., N. L. R. B., Thirteenth Annual Report, pp. 35 et seq. (1948).

that a different unit has been established by a prior Board determination." Sen. Rep. No. 105, 80th Cong., 1st Sess. (1947), in 1 Legislative History of the Labor Management Relations Act, 1947, p. 418 (1948). And the House Report was to the same effect. H. R. Rep. No. 245, 80th Cong., 1st Sess. (1947), id. at 327-9. In view of such express legislative consideration, we are unable to accept the contention that Sections 10 (b), (c), (e) and (f) of the new Act introduced any restriction on the scope of the Board's discretion in this sort of case.[8] N.L.R.B. v. Continental Oil Co., 10 Cir., 1950, 179 F.2d 552.

To establish the charge that the Board abused its discretion, the Company argues: first, that the work of the die sinkers is functionally integrated with that of other employees under similar working conditions and, therefore, the unit should be larger; second, that the history of collective bargaining in the plant has been on a broader basis, the die sinkers having been satisfactorily represented by the Machinists Union for many years; third, a unit of die sinkers constitutes a mere segment of a craft. It finds support for this last contention in the fact that the qualifications for membership in the Die Sinkers Union are not confined to journeymen and their apprentices but extend to all who work on dies or parts thereof; and in the further fact that the Die Sinkers Union has never requested such a unit in any other plant and that the Board had refused to grant a similar request for this plant in 1946.

█ It may be conceded that the factors cited by the Company are not without merit and tend to support the argument for a broader bargaining unit. But we do not conceive it to be our function to find whether a more desirable unit than that chosen exists within the plant. The choice among several possibly appropriate units having been made by the Board, our only concern is whether the record as a whole discloses an abuse of discretion. We find no such abuse here.

Even accepting the Company's criteria, which are certainly not all-inclusive, they were satisfied by the Board. From the point of view of functional pattern, the die sinkers are the highest skilled and highest paid employees in the toolroom. They alone can and do sink irregular impressions on forging dies and devote all their time thereto. They work on separate machines in a separate area under their own foreman.

█ As to the history of collective bargaining in the plant, we must recognize that, under Section 9(b) of the Act, the Board is expressly precluded from considering as controlling a prior determination that a broader unit was appropriate. The right of the die sinkers to make a choice now is in no way impaired by the fact that they have been satisfactorily represented in the past by the Machinists Union. In considering this phase of the problem, the Board relied on the fact that the die sinkers always maintained membership in the Die Sinkers Union, bargained for and established separate apprenticeship ratios for die sinker apprentices and always handled their grievances with the Company through a special representative.

█ The Company's objection of craft segmentation is met by the Board's reliance on the rationale approved in May Dept. Stores Co. v. N.L.R.B., 1945, 326 U.S. 376, 380, 66 S.Ct. 203, 207, 90 L.Ed. 145. It was held in that case that a unit of men's alteration employees need not necessarily include employees who altered women's and fur garments, because the former had "a degree of self-organization and a special trade which sufficiently differentiated them from other employees." Cf. N.L.R.B. v. Lettie Lee, Inc., 9 Cir., 1944, 140 F.2d 243, 248.

The order of the Board, directing the Company to cease and desist from refusing to bargain collectively with the Die Sinkers Union in its Port Huron, Michigan, plant is

Affirmed.

---

8. As to the effect of these provisions generally, see Eastern Coal Corp. v. N. L.

R. B., 4 Cir., 1949, 176 F.2d 131, 134 et seq.