LOCAL 1325, RETAIL CLERKS INTERNATIONAL ASSOCIATION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Adams Drug Company, Inc., Intervenor.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ADAMS DRUG COMPANY, Inc., Respondent.

Nos. 21938, 22009.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 19, 1968.

Decided July 2, 1969.

Mr. George R. Murphy, with whom Mr. S. G. Lippman, Washington, D. C., was on the brief, submitted on the brief for petitioner in No. 21,938.

Mr. John D. Burgoyne, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief, for petitioner in No. 22,009 and respondent in No. 21,938.

Mr. William J. Sheehan, Providence, R. I., with whom Mr. Abraham J. Harris, Washington, D. C., was on the brief, for respondent in No. 22,009.

Before DANAHER,* McGOWAN and LEVENTHAL, Circuit Judges.

McGOWAN, Circuit Judge:

The National Labor Relations Board decided that the Adams Drug Company, a retail drug chain with stores in several states, had violated Section 8(a) (5) and (1) of the National Labor Relations Act by refusing to bargain with Retail Clerks Local 1325 after it had won an election and had been certified by the Board as the representative of the employees who worked in the Company's stores located in Rhode Island. In No. 22,009, the Board has petitioned for enforcement of its bargaining order directed to the Company.[1] The Company contends that:

(1) The Board erred in determining that an appropriate bargaining unit consisted of the company's employees in all of its Rhode Island drug stores; and that

(2) The Board erred in not giving the employer the opportunity, either before the regional director during the certification proceeding, or before the hearing examiner during the unfair labor practice proceeding to show by means of a hearing that the Union made election campaign claims which were inaccurate and prejudicial to a fair election.

Because we hold that the Board erred in its unit determination, and deny enforcement on that ground, we do not reach the second issue.

I

The Union on April 25, 1966 petitioned the Board to hold a representation election for a unit composed of "all employees working in the Employer's Rhode Island Stores." When a hearing was held on this petition, the Company urged that the smallest appropriate unit would include the employees of all of the Company's New England stores.[2]

---

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

1. In No. 21,938 the Union has petitioned this court to review and modify the remedial aspects of the order entered by the Board below. That petition was consolidated with the Board's for purposes of this appeal. Because of the disposition we make of the Board's request for enforcement, we have no occasion to consider the claims made by the Union.

2. A unit controversy must travel a circuitous route before it reaches court. After a petition is filed, unless there are grounds for not proceeding to an investigation and certification, the Regional Director will send out notice of a hearing to all interested parties. This hearing, held before a hearing officer, creates the record on which the Regional Director makes the unit determination. The Regional Director's decision is subject to review on limited grounds by the Board itself. An election is then held in the unit found appropriate. If the union wins, and the Regional Director decides (again subject to review by the Board on limited grounds) that there were no material irregularities, the union will then be certified as the employee bargaining representative.

Except in the most extraordinary circumstances, *see* Leedom v. Kyne, 358 U.S.

At this hearing it developed that the Company had a total of eighty-three retail drug stores, most of them concentrated in New England and New York, but with some located as far away as Kansas and Oklahoma. There were forty-five stores in the New England region: Twenty-five were in Rhode Island, thirteen in Massachusetts, and seven in Connecticut. Of the twenty-five Rhode Island stores, all but one were located in the northeast section of the state in the Providence-Pawtucket-Warwick metropolitan area. Four of the Massachusetts stores are less than 8 miles from these Greater Providence stores and one of these—the store in Attleboro, Massachusetts—is in the Providence Metropolitan area. The other nine Massachusetts stores were more distant. The seven stores in Connecticut were all 50 miles or more from any of the Rhode Island stores.

Certain aspects of the Company's operations were centralized. The central office and warehouse, located in Rhode Island, kept employee and other records, the payroll, and a central inventory of merchandise for all the company stores. All the stores in New England made up an operating division. Day-to-day operating responsibility was vested in the manager of an individual store. The store manager also, subject to central office approval, hired almost all of a store's employees, recommended promotions, and determined the size of the store's work force.

On the basis of the facts developed at the hearing, the Board's Regional Director concluded that a unit composed of the Company's Rhode Island stores was inappropriate because the Rhode Island stores did not constitute an administrative division of the Company's operations and further because there was no reason to distinguish the Rhode Island stores from nearby stores in Massachuetts and Connecticut.[3] Since the Union declined to participate in an election in respect of any other unit, the Regional Director dismissed the Union's petition.

The Union sought review by the Board of this ruling.[4] The Board reversed the Regional Director and found that a unit limited to Rhode Island was appropriate. The Board did not dispute the Regional Director's finding that the Rhode Island stores were not an administrative division of the company, and it conceded that on the facts shown it could approve as "appropriate" a unit which was (1) "Employer-wide," (2) "New England area-wide," (3) Providence metropolitan area-wide, or (4) an individual store. Stating that "the Board has long held that the petitioning labor organization needs only to establish that the group of employees it has attempted to organize and seeks to represent is 'an appro-

---

184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), neither the original unit determination made prior to the election, nor the final certification, is subject to direct judicial review. Instead, a company wishing judicial review must refuse to bargain with the certified union. This will ordinarily initiate an unfair labor practice proceeding in which the employer can defend on the ground that the certification was invalid, and may have judicial review of the resulting Board order. Thus, in the case at hand, the Company was required to invite an unfair labor practice proceeding in order to bring the unit determination under judicial scrutiny.

3. In his decision, the Regional Director said:
   [T]he Rhode Island stores alone do not comprise [a] complete geographic or ad-

ministrative division of the Employer's operations, such as would differentiate them from the remaining stores under the responsibility of an area supervisor or the remaining stores of the chain.

4. The Company contends that the Board, in accepting review, failed to assert any of the grounds for review there enumerated. The Company therefore argues that the Board's own decision should be treated as a nullity. If, despite the form of a party's request for review, the Board determines that there is an issue warranting its review, it is hard to see what policy is served by judicial interference with that determination, at least short of a flagrantly discriminatory application of the Rule. See Pepsi-Cola Buffalo Bottling Co. v. NLRB, 409 F.2d 676 (2nd Cir. 1969).

priate unit,' " the Board went on to find:

> [W]e are persuaded that the employees in the Rhode Island stores enjoy a special community of interest apart from the others by reason of the State's regulation of the retail drug industry. The Board has stated in cases arising in the insurance industry that groupings of district offices within a State may constitute appropriate geographic area units. We believe the same considerations apply to retail drug chains. The State of Rhode Island, under its police power, can and does regulate pharmacies and the sale and distribution of pharmaceutical cosmetic, food and other products within its political boundaries. This control by the State also affects the terms and conditions of employment of all employees in the drug stores.[12] We conclude, therefore, that
>
> 12. Without attempting to detail the extent of this control, we note that the State of Rhode Island has on its statute books laws governing the licensing of pharmacies and of pharmacists, and laws pertaining to health and safety in the operation of pharmacies and the sale and distribution of pharmaceutical, cosmetic, food and other products dispensed by drug stores within the State. The State of Rhode Island also imposes sales and payroll taxes and has other laws setting forth minimum standards for health and safety in employment.
>
> all drug stores of the Employer within the boundaries of the State of Rhode Island constitute a clearly delimited geographic area appropriate for purposes of collective bargaining. 164 N.L.R.B. No. 71 (1967) (footnote 11 omitted, footnote 12 included).

It therefore concluded that the Rhode Island stores were "an" appropriate unit, notwithstanding the fact that there might be other appropriate units. This determination was not disturbed in the unfair labor practice proceeding.

The Company contests the appropriateness of this unit on several grounds. First, the Company points out that the state regulation of retail drug stores referred to by the Board is concerned with the examination and registration of pharmacists—employees whom the Board determined to be "supervisors" and therefore not within the Adams Drug Unit. Second, the other food, drug and cosmetic laws of Rhode Island, if they apply to the Company at all, would only affect the management personnel, and would have "no effect on hours, wages, and conditions of employment." Thus the Company claims there is nothing about the regulatory laws of Rhode Island which make a state-wide unit appropriate. Third, the Company contends that, even if the stores in the Providence metropolitan area would constitute an appropriate unit, this would not validate the state-wide unit chosen by the Board, since this unit includes a Rhode Island store outside the Providence metropolitan area, and excludes a Massachusetts store within that area. Fourth, the Company argues that the Board's earlier decisions, which found state-wide units appropriate for insurance field offices, were inapposite, for the reason that, unlike the situation in those cases, the employees in each of the Company's stores worked essentially "for and within only one store" and did not work throughout a "territory." The Company therefore concludes that the Board has acted arbitrarily, and in fact has constructed a unit based solely on the extent of the Union's organization in violation of Section 9(c)(5) of the Act. Before dealing with these contentions, however, it may be useful to examine the statutory framework under which the Board approves units, and to identify the standards to be applied by the Board and the scope of judicial review of its actions.

## II

In choosing an "appropriate unit" for collective bargaining purposes, the Board performs an extraordinarily important and difficult task, touching on strong interests of the employer, the union, and the employees. The Board often must choose among several alternative units, each of which may have

rational foundations. For a retail chain consisting of a network of individual stores, one can conceive of a wide assortment of alternative units. To name but a few of the alternatives, the unit might consist of all the employees who work within the stores in a particular geographic area or administrative division of the company, or all the employees working within a single outlet. Because the representation election is held only within the approved unit, the boundaries of the unit chosen by the Board will often have a substantial impact on whether a union's organizing efforts prove successful.

The interest of employer and union will often be in conflict in such situations. The latter will often contend for a narrower unit than the company desires.

From the union's standpoint, a narrowly defined unit may markedly influence the success of an organizing drive, for it may be much easier to win elections in a few separate stores than to mount a successful campaign simultaneously in a number of plants or stores spread out over a substantial geographical area. Conversely, the employer may favor a broader unit not only because it will make the job of the union organizer more difficult but also because it may be simpler administratively to deal with a single bargaining agent representing all of its places of business in a given area.[5]

There are circumstances, however, in which the union will seek a unit broader than that which a company might prefer. For example, a large union majority in one store will enable the union to represent the employees in another store, where the union narrowly lacks a majority, if the two stores are combined into one unit.

Though often faced with these conflicting interests of union and management, the Board receives little guidance from the statute as to how it should make unit determinations. Section 9(a) of the Act makes clear that the representatives selected "by the majority of the employees in a unit appropriate" for purposes of collective bargaining "shall be the exclusive representatives." But Section 9(b) provides remarkably little help as to how the Board is to decide whether a unit is "appropriate." It simply states:

The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof.

Section 9(c) (5), later added by Congress in response to some early unit decisions which were felt to be too favorable to unions, further provides:

In determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling.

Thus Congress has provided the Board with two vague standards, one affirmative and one negative, to guide its unit determinations. The affirmative standard is simply that the Board should try "to assure to employees the fullest freedom in exercising" their rights under the statute. The "rights" referred to are those summarized in Section 7 of the Act. They include the rights to organize, bargain collectively, and engage in concerted activities, as well as the "right to refrain from any or all such activities." Section 9(c) (5), with its ambiguous word "controlling," contains a warning to the Board almost too Delphic to be characterized as a standard. Nonetheless, it has generally been thought to mean that there must be substantial factors, apart from the extent of union organization, which support the appropriateness of a unit, although extent of organization may be considered by the Board and, in a close

5. A. Cox and D. Bok, Labor Law 333 (1965).

case, presumably may make the difference in the outcome.[6]

■ The lack of precise statutory standards, and the nature of the task the Board has been assigned, both indicate that reviewing courts should give the Board broad discretion in the determination of whether a unit is appropriate. The very vagueness of the statute shows that Congress was largely delegating to the Board the task of developing, through experience and by means of expertise, the standards of appropriateness. When Congress has broadly delegated such a task to an agency, it is not for a court to substitute its own judgment for a rationally supported position espoused by the agency. Furthermore, the nature of the task involved makes both impossible and undesirable the development of a neat formula for the determination of whether a unit is appropriate. As the Supreme Court has said: "The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. * * *"[7] There are many factors which are relevant to whether a unit is appropriate, and the weight given to a particular factor will often differ depending upon the facts of the individual case. "No other course is practicable in a complex industrial society where organizational patterns differ from industry to industry and plant to plant."[8] Furthermore, because unit determination involves line drawing in which people are grouped or separated into decision-making units, it is "by nature" more "an exercise in political science" than most other legal determinations.[9] For all of these reasons—the fact that the task has been delegated to the agency, the impossibility of developing precise standards, the importance of particular facts to the correct decision—a unit determination is not the kind of decision to which courts are well equipped to apply intensive judicial review. Good reason supports, therefore, the view expressed by the Supreme Court, and this court as well, that unit decisions, because they involve a "large measure of informed discretion," are "rarely to be disturbed."[10]

This is not to say, however, that courts have no role to play in the area of unit determination. The Act does provide for judicial review of the Board's deci-

---

6. NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965), makes clear that 9(c) (5) does not prohibit the Board from considering extent of organization "as one factor" in its unit determination. If it can be considered as a factor, then this would seem to imply as a matter of simple logic that the factor will sometimes make the difference between whether a unit is appropriate or not. See Note, the Board and Section 9(c) (5): Multilocation and Single Location Bargaining in the Insurance and Retail Industries, 79 Harv.L. Rev. 811, 820–822 (1966). The Third Circuit has, however, adopted the more stringent view that the nonorganizational factors must be substantial enough to justify a finding of appropriateness without the help of extent of organization. See NLRB v. Western and Southern Life Ins. Co., 3 Cir., 391 F.2d 119, 121– 122, cert. denied 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 439 (1968); Metropolitan Life Ins. Co. v. NLRB, 3 Cir., 328 F.2d 820, 829, vacated and remanded, 380 U.S. 523, 85 S.Ct. 1325, 14 L.Ed.2d

265 (1965) ("the certified appropriate unit must be in and of itself appropriate apart from extent of employee organization.").

7. Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947); see Retail, Wholesale & Department Store Union v. NLRB, 128 U.S. App.D.C. 41, 45, 385 F.2d 301, 305 (1967).

8. Mueller Brass Co. v. NLRB, 86 U.S. App.D.C. 153, 155, 180 F.2d 402, 404 (1950).

9. Hall, The Appropriate Bargaining Unit: Striking a Balance Between Stable Labor Relations and Employee Free Choice, 18 Western Reserve L.Rev. 479, 481 (1967).

10. Packard Motor Car Co. v. NLRB, 330 U.S. at 491, 67 S.Ct. at 793; Retail, Wholesale & Dept. Store Union v. NLRB, 128 U.S.App.D.C. at 45, 385 F.2d at 305.

sions, including unit determinations, before enforcement. And the cases show that courts must take seriously their duty to subject unit determinations to some, albeit limited, judicial scrutiny. It is precisely because of the importance of judicial review that the Supreme Court held that a Board's unit determination could not be enforced if the Board failed to " 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' " [11] And, when the Board in its unit determinations has relied too heavily on extent of organization,[12] failed to articulate substantial reasons to support its decision,[13] or acted in a way so inconsistent with the Board's own decisions as to suggest arbitrariness,[14] the Courts of Appeals, particularly in the last four years, have not shrunk from their duty to refuse enforcement.

A court obviously should not examine a unit determination of the Board with a disposition to substitute its own judgment for that of the Board if it finds that it might have preferred the selection of an alternative unit. Instead, a court must review the Board's decision to see, first, whether the Board has articulated the factors which underlie its choice of a unit; and, second, to see whether those factors, when viewed against the backdrop of other Board decisions and a statute which has given the agency broad discretion in the performance of a difficult task, are sufficiently substantial to dispel an impression of unreasoned arbitrariness and to negate an inference that "extent of organization" was the primary basis for the Board's action. It is with this standard in mind that we examine the Board's unit determination in this case.

### III

We look first to the Board's own prior decisions. The visible fluctuations in policy reflected in the Board's retail unit determinations over the last twenty-five years [15] are, at the least, at odds with any belief that *stare decisis* has some limited virtue, even for administrative agencies. Nevertheless, in its recent unit determinations involving retail chain stores, the Board has rather consistently invoked several factors which it now considers relevant to appropriateness. These are: [16] (1) The administrative structure of the employer and the extent to which a single store has administrative autonomy; (2) the distance between stores; (3) the extent to which employees are interchanged among various stores in the chain; (4) the extent of organization; (5) the col-

11. NLRB v. Metropolitan Life Ins. Co., 380 U.S. at 443, 85 S.Ct. at 1064.

12. See Metropolitan Life Ins. Co. v. NLRB, 327 F.2d 906 (1st Cir. 1964), vacated, 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965) ; Metropolitan Life Ins. Co. v. NLRB, 328 F.2d 820 (3rd Cir. 1964), vacated, 380 U.S. 523, 85 S. Ct. 1325, 14 L.Ed.2d 265 (1965).

13. NLRB v. Purity Food Stores, Inc., 376 F.2d 497, 501 (1st Cir.), cert. denied, 389 U.S. 959, 88 S.Ct. 337, 19 L.Ed.2d 368 (1967) ; NLRB v. Davis Cafeteria, 358 F.2d 98, 100 (5th Cir. 1966).

14. *See* Metropolitan Life Ins. Co. v. NLRB, *supra*, 327 F.2d 906 ; NLRB v. Frisch's Big Boy Ill-Mar, Inc., 356 F.2d 895 (7th Cir. 1966) ; NLRB v. Davis Cafeteria, *supra*, 358 F.2d 98 ; NLRB v.

Davis Cafeteria, Inc., 396 F.2d 18 (5th Cir. 1968).

15. *See, e. g.,* Koppers Stores, 73 N.L.R.B. 504 (1947) (single chainstore appropriate unit) ; Safeway Stores, Inc., 96 N.L.R.B. 998 (1951) (presumption that only units as broad as employer's "administrative division or area" appropriate) ; Sav-On Drugs, Inc., 138 N.L.R.B. 1032 (1962) (single store unit an additional "possibility" as appropriate unit) ; Frisch's Big Boy Ill-Mar, Inc., 147 N.L.R.B. 551 (1964) (single store unit "presumptively appropriate" in retail field). *See generally* Note, *supra* n. 6, 79 Harv.L.Rev. at 817–818.

16. For a discussion of how the Board has applied these factors *see generally* Note, *supra* n. 6, 79 Harv.L.Rev. at 819–833 ; Hall, *supra* n. 9, 18 Western Reserve L. Rev. at 487–531.

lective bargaining history of the particular employer; and (6) whether there are competing unions trying to organize.[17] When one examines this case in terms of those factors, it becomes apparent, as the Board's opinion acknowledges, that any one of several units other than the one the Board selected would seem appropriate.

A single store unit arguably would be appropriate because (a) each store manager has substantial authority in the day-to-day operation of his store, and (b) there is little interchange between employees of different stores.[18] A unit consisting of all the stores in the New England area would also appear appropriate because New England is an administrative division for the Company. The considerable degree of central office control over the hiring and operations of the stores might also justify a company wide unit. Finally, a unit consisting of all the stores in the Providence metropolitan area might be appropriate because of the geographical proximity of those stores.

■ The Board did not choose any of these alternative units. Instead, the Board approved a state-wide unit for a retail chain—apparently for the first time, for we have not found, and the Board has not cited, a single prior Board decision in which this was done. The existence of four alternative units, each rather clearly "appropriate," does not, of course, make the choice of a state-wide unit inappropriate, even though such a choice is unprecedented. This court has acknowledged that the existence of alternative units which are "appropriate" will not alone warrant reversal if the Board has chosen some other unit which is also appropriate. *See* Retail, Wholesale & Department Store Union v. NLRB, 128 U.S.App.D.C. 41, 385 F.2d 301 (1967); Mueller Brass Co. v. NLRB, 86 U.S.App.D.C. 153, 180 F.2d 402 (1950). As novel a departure from established norms as the Board's action in this instance involves does, however, justify a close examination of the reasons adduced by the Board.

In its decision, the Board gave two reasons for its choice of a state-wide bargaining unit: (1) It pointed to the importance of Rhode Island state laws, particularly those laws regulating drug stores, in creating a special community of interest for the employees of the Rhode Island stores; and (2) it suggested that a state-wide unit in Rhode Island, since it was closely coincident with a unit consisting of the stores in the Providence metropolitan area, might be warranted by reference to geographical proximity.

---

17. Since there was no prior collective bargaining in the Adams Drug chain, and no competing union, factors (5) and (6) are not relevant here.

18. Although it is extremely difficult to fathom much consistency among the Board's retail chain store unit determination, it does appear that a single store unit is now "presumptively appropriate," Frisch's Big Boy Ill-Mar, Inc., 147 N.L.R.B. 551 (1964). Thus, a single store unit, if requested, will be approved unless it is shown that a single store "lacks meaningful identity as a self-contained economic unit." *See* Haag Drug Co., 169 N.L.R.B. No. 111 (1968). Although single store units have met with much resistance in the courts, see NLRB v. Frisch's Big Boy Ill-Mar Inc., 356 F.2d 895 (7th Cir. 1966); NLRB v. Purity Food Store, Inc., *supra* n. 13, a preference for such units could be justified in principle "by a policy of encouraging the maximum feasible employee freedom of choice" because "[m]aximum employee self-determination calls for narrowing the size of each unit to the greatest possible extent, thus maximizing the importance of each employee vote, reducing the number of employees whose choice is overridden by a majority, and tending to reduce the number of conflicting interests within each unit." Note, *supra* n. 6. 79 Harv.L.Rev. 833–34. However, the Board, though rarely refusing to find appropriate a single store unit when requested by the union, cannot be said to prefer such single store units since it will often approve broader units even though a single store would also be appropriate. This practice the Board defends on the ground that although a single store unit may be appropriate, a broader unit may "also be * * * appropriate." *See* Haag Drug, *supra*.

## A. State Laws

■ There is a certain superficial plausibility to the Board's reliance on state laws and regulations as the critical factor in its justification for a state-wide unit. Since unit determination does involve drawing a line somewhere, at first glance it hardly seems irrational to use the political boundaries of a state as the place to draw that line. Intuitively, it also seems possible that there may be some state laws in Rhode Island which might affect the hours, wages and conditions of employment of the company's Rhode Island employees to a degree warranting the conclusion that they "enjoy a special community of interest apart from the [non-Rhode Island employees]." Unfortunately, as one probes the Board's identification of these laws, the rationality of this circumstance evaporates.

The "state's regulation of the retail drug industry," the factor to which the Board's decision gives greatest weight, appears to have no real impact on the employees included within the unit approved by the Board. Those laws require registration of pharmacists, prohibit non-pharmacists from filling prescriptions and dispensing drugs, and require pharmacists to keep certain records. See R.I.Gen.Laws, Title 5, ch. 19, §§ 1–37 (1956). As the Company points out, however, the Board excluded pharmacists from the unit certified in this case. Furthermore, while the laws regulating pharmacists are of course different in form and language in Massachusetts and Connecticut, those states also appear to prohibit those who are not registered pharmacists from dispensing drugs and filling prescriptions.[19] The Board conspicuously fails, both in its opinion and on appeal, to point to any specific aspects of the Rhode Island regulatory scheme which make the duties of the employees included within the unit different from the duties of the employees in Massachusetts and Connecticut.

■ Apart from the state statutes affecting pharmacists, the Board's opinion, in a footnote, refers vaguely to "laws pertaining to * * * cosmetic, food and other products dispensed by drug stores within the State." See *supra* at 1198. The Board's opinion fails, however, to cite particular laws, or more importantly, to explain how these laws affect hours, wages and working conditions of the Rhode Island employees in such a way as to create a "special community of interest apart from" the non-Rhode Island employees.

The Board's opinion, in the same footnote, refers in a general way to the fact that "[t]he state of Rhode Island also imposes sales and payroll taxes and other laws setting forth minimum standards for health and safety in employment." See *supra* at 1198. The existence of a state sales and payroll tax does suggest that the Company will necessarily be keeping track of the total sales of its Rhode Island stores, as well as of the wages paid to Rhode Island employees. It might well be that this information would be convenient to have at hand for collective bargaining. On the other hand, there is nothing in the record to indicate that the company could not supply similar economic data for a non-state-wide unit. As for the reference to laws affecting "health and safety in employment," there are no citations to specific statutes; and the Board again fails to explain how such laws, in any practical way, differentiate the employees in the Rhode Island stores from others outside Rhode Island.

An examination of prior decisions of the Board only strengthens our conclusions that the Board's reliance on state laws is unwarranted in this case. There is not a single Board decision in which state laws were mentioned as a factor relevant to unit determination for retail stores. In fact, the Board has in the past approved a unit for a retail drug chain consisting of all the stores in a metropolitan area which extended into

19. *See* Mass.Gen.Laws, ch. 112 § 24 et seq. (1966); Conn.Gen.Stat. § 20–163 et seq. (1968).

two states. In *Crown Drug Co.*,[20] the employer drug chain operated 69 retail drug stores in Kansas, Missouri and Oklahoma. The employer asked for a chainwide unit, but the Board approved a unit consisting of the 31 stores in the Kansas City metropolitan area which consisted of stores in both Missouri and Kansas. If state regulation is an important factor for determining appropriateness for retail chain store units, it seems strange that it has never been mentioned in an earlier case. More importantly, the existence of this earlier and apparently inconsistent decision would seem to place the Board under some obligation to explain why state regulation was of critical importance in the case at hand but not in its earlier decisions.

The Board relies, both in its opinion and brief, on its prior unit determinations for insurance field offices to support the importance of state laws in justifying state-wide units. While it is true that for many years the Board would approve only state-wide units for insurance field offices, Metropolitan Life Ins. Co., 56 N.L.R.B. 1635 (1944), the presumption in favor of state-wide units was not based on the existence of state laws, but instead on the Board's belief that rapid unionization in that industry made smaller units unnecessary to encourage organization.

Perhaps the closest the Board has come in an insurance case to relying on state laws as a justification of a state-wide unit is Allstate Ins. Co., 118 N.L.R.B. 855 (1957). There the Board approved as appropriate a unit consisting of all the insurance agents employed by Allstate in Ohio. The company did not contest the appropriateness of a statewide unit, but did want included in that state-wide unit all underwriters, claim examiners and adjusters, and not just agents. The Board refused, and pointed to several factors which made the "employment conditions for agents differ substantially from those of underwriting and claims personnel." *E. g.*, only agents were sales personnel, and their method of pay and employment contracts were different). One of the factors relied upon was the fact that agents were "the only employees required by the state of Ohio to be licensed. \* \* \*" However, this was only one of several factors. More importantly, the Board used state licensing not to justify a state-wide unit but to justify *excluding* from a state-wide unit certain employees who also worked in that state. In this regard, *Allstate* really points up the irrationality of the Board's decision in the case at hand, for here the Board used a state licensing requirement for employees who were *excluded* from the unit to justify a state-wide unit for other employees who did not need to be licensed. In any event, the Board has now officially disapproved its earlier policy of preferring state-wide units, Quaker City Life Ins. Co., 134 N.L.R.B. 960 (1961), and it now approves units consisting of single field offices, and all the offices in a metropolitan area, as well as other "narrow" units, without apparent regard to whether the unit approved includes offices in more than one state.[21] For all these reasons, the Board's reliance on the early insurance cases seems misplaced.

B. *Geography*

■ The Board, in its opinion, suggests that a state-wide unit was appropriate in this case because in Rhode Island a state-wide unit is nearly coincident with a unit consisting of all the stores in the Greater Providence area. The state-wide unit, at least at the time of the original decision, excluded only

20. 108 N.L.R.B. 1126 (1954). *See* Barr's Jewelers, 131 N.L.R.B. 235 (1961) (approved unit consisted of 10 retail jewelry stores in greater Philadelphia area including stores in Camden and Vineland, New Jersey).

21. *See, e. g.*, Metropolitan Life Ins. Co., 138 N.L.R.B. 734 (1962) (unit approved consisting of employees of Sioux City, Iowa, Fargo, N. D., and Sioux Falls, S. D.). *See generally*, Note, *supra* n. 9, 79 Harv.L.Rev. 813–817.

one store which was within the Greater Providence area, and included only one which was outside that area.[22] Therefore, the Board reasoned that, since a unit consisting of all the stores in the Metropolitan area would surely be appropriate, so should a state-wide unit which was nearly the same. The argument not only has a bootstrap quality about it, but also seems flatly inconsistent with earlier decisions in which, on the basis of geographical proximity, the Board has

(1) refused to expand a unit beyond a metropolitan area to include one store outside that area;[23] and

(2) included within a metropolitan area unit stores in another state.[24]

Particularly in light of these prior decisions, it strikes us as arbitrary to draw the unit boundary at the state line, and then attempt to justify the unit on the ground of geographical proximity. The state-wide unit includes a "distant" Rhode Island store and excludes a "nearby" Massachusetts store.

## IV

On this record, we conclude that the reasons given by the Board do not justify its conclusion that a state-wide unit was appropriate. The factor upon which the Board has primarily relied—state regulation of the retail drug business by Rhode Island—appears upon close examination to be patently sophistic, given the fact that pharmacists are excluded from the unit. Nor has the Board explained how any other Rhode Island state laws justify drawing the boundary of the unit at the state lines. And, because there appears to be no substantial reason in terms of state laws to draw the line at state boundaries, we conclude that it is indeed arbitrary to include in the unit a Rhode Island store some distance from metropolitan Providence while excluding a store which is admittedly part of that area. Finally, we think the circumstances of this case suggest that the Board has violated the mandate of Section 9(c) (5) as well by tacitly making extent of organization "controlling." Apart from the fact that the Union requested it, the Board's choice of a state-wide unit appears to be without substantial justification. And to choose this unit, the Board overruled its regional director, by-passed several appropriate alternatives, and in effect ignored the criteria developed in its own prior retail chain store unit determinations. Given the weaknesses of the Board's reasons in favor of a state-wide unit, we are unable to say that there are substantial reasons apart from extent of organization, to justify the Board's action.

Enforcement denied.

---

**22.** By the time the Board election was held, there were two additional stores in Rhode Island but outside the Greater Providence area. During the unfair labor practice proceeding, the Company urged that the record be re-opened and the unit decision be reconsidered in light of this fact. The examiner declined, however, because (1) "there is no evidence that any effort was made to bring the existence of these stores to the Board's attention during the period of approximately 6 months which elapsed between the opening of the second of these stores and issuance of the Board's representation decision, or indeed until after the issuance of the complaint herein;" and (2) the Board's statement that there was only one store in Rhode Island outside the Providence area was not "essential to the Board's finding," because it was the "state's regulation of the retail drug industry" which was deemed essential.

**23.** See Barr's Jewelry Co., supra n. 17, 131 NLRB 235 (1961) (for an 11 store chain, an appropriate unit would include the 10 stores in the greater Philadelphia area but not the 11th store which was in Norfolk, Va.).

**24.** See Crown Drug, supra n. 10; Barr's Jewelry, supra n. 20 & n. 23.