418 F.2d 1177
 71 L.R.R.M. (BNA) 3004, 135 U.S.App.D.C. 341
 FOOD STORE EMPLOYEES UNION, LOCAL 347, AMALGAMATED MEAT
CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HECK'S, INC., Respondent, Food Store Employees Union, Local
347, AmalgamatedMeat Cutters and Butcher Workmen
of North America, AFL-CIO, Intervenor.
 Nos. 21809, 21921.
 United States Court of Appeals District of Columbia Circuit.
 Argued Jan. 16, 1969.
Decided July 18, 1969.
 
 Miss Judith A. Lonnquist, Chicago, Ill., with whom Messrs. Mozart G. Ratner, Washington, D.C., and Albert Gore, Chicago, Ill., were on the brief, for petitioner in No. 21,809 and intervenor in No. 21,921.
 Mr. Arthur A. Horowitz, Attorney, National Labor Relations Board, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Mrs. Mancy M. Sherman, Attorney, National Labor Relations Board, were on the brief, for respondent in No. 21,809 and petitioner in No. 21,921.
 Mr. Frederick F. Holroyd, Charleston, W. Va., with whom Mr. George V. Gardner, Washington, D.C., was on the brief, for respondent in No. 21,921.
 Before BAZELON, Chief Judge, and McGOWAN and LEVENTHAL, Circuit judges.
 McGOWAN, Circuit Judge:
 
 
 1
 These cases arose out of the organizational efforts of the Food Store Employees Union, Local 347 ('Union') in the St. Albans, West Virginia, retail store of Heck's, Inc. ('Company'). The National Labor Relations Board, after an unfair labor practice proceeding, decided below that the Company had
 
 
 2
 (a) violated Section 8(a)(1) of the National Labor Relations Act
 
 
 3
 ( 1) by promulgating and enforcing an unlawfully broad no-solicitation rule; (2) by interrogating and threatening its employees about their union activities; (3) by creating the impression of surveillance of the union activities of the employees; and (4) by seeking to induce employees to engage in surveillance;
 
 
 4
 (b) violated Sections 8(a)(3) and (1) of the Act by transferring one employee and discharging three others because of their union activities; and
 
 
 5
 (c) violated Sections 8(a)(5) and (1) of the Act by refusing to bargain with the Union after the Union had offered to show that it had authorization cards signed by a majority of the employees.
 
 
 6
 The Board ordered the Company to cease and desist from its unfair labor practices, to reinstate and otherwise make whole those employees unlawfully transferred or discharged, and to bargain collectively with the Union upon request. In No. 21,921 the Board petitions for enforcement of its order. In No. 21,809 the Union seeks review of the adequacy of the Board's order with respect to the Company's solicitation rules. For the reasons hereinafter appearing, enforcement is granted in No. 21,921 except as to the bargaining order for which a remand is necessary; and in No. 21,809 decision is deferred pending a remand to the Board for reexamination of the scope of its order.
 
 
 7
 * A. The 8(a)(1) Violations.
 
 
 8
 1. The No-Solicitation Rule. The Union began its organizational efforts in the St. Albans store in October of 1965, when a Union representative visited the store several times and talked with employees. Early in November, the Union representative distributed organizing literature to the employees in the store, but, when he returned on November 8, 1965 to distribute more such literature, he was stopped by the assistant manager and told that the Company had a rule against distributing literature in the store. It appears that the Company had signs to that effect posted at the store's entrance and near an office on the selling floor, as well as a notice on the bulletin board in the employees' upstairs lounge.[1] The Company also had a broadly worded no-solicitation rule in the handbook which it distributed to all employees.[2]
 
 
 9
 From the hearing record it is clear that the Company's supervisors interpreted the no-solicitation and no-distribution rules to apply to the nonworking areas where the employees ate lunch and took their rest breaks, and to apply to all employees at all times during store working hours irrespective of the actual working times of individual employees. The Company vice-president and personnel manager in fact held meetings with all the employees of the St. Albans store, in the course of which he told them they would be fired if they engaged in any activities on behalf of the Union while on Company premises.
 
 
 10
 There is substantial evidence in the record as a whole to support the Board's conclusion that the Company violated Section 8(a)(1) by promulgating and maintaining its no-solicitation and no-distribution rules. Although it is clear that a retail employer can prohibit solicitation in selling areas even during an employee's free time,[3] an employer may not prohibit an employee from soliciting during his free time in nonselling areas, or from distributing organizational literature in nonselling, nonworking areas.[4] The Company argues that, since the no-solicitation and no-distribution rules were never found by the Board actually to have been used by the Company to discipline employees for solicitation or distribution in nonselling areas, there can be no finding of an 8(a)(1) violation. However, since there is evidence that the Company made unmistakably apparent its willingness to enforce its rule in an illegal manner, it makes no difference that it may never have had to do so. The rule as so construed, backed by the Company's willingness to enforce it if necessary, is sufficient to support an 8(a)(1) violation because of the substantial risk that the Company in fact deterred employees from engaging in protected activity.[5]
 
 
 11
 2. Other 8(a)(1) Violations. There is overwhelming evidence in the record to support the Board's conclusions that the Company violated Section 8(a)(1) by interrogating and threatening employees, creating the impression of, and actually engaging in, surveillance, and seeking to induce employees to inform the Company of their fellow employees' union activities. The Company in fact does not contest that the incidents in question took place, but instead simply contends that two of the employees (Doss and White) subjected to these tactics were 'supervisors.' The Company therefore argues that its actions directed toward them cannot violate Section 8(a)(1). There is, however, no support for the Company's suggestion that Doss was a supervisor. As for White, the Board's conclusion that she was not a 'supervisor' seems, as discussed hereinafter, amply supported by the record. In any event, as the Board points out, the Company never indicated that it was limiting its coercive tactics to supervisors, and it in fact knew that White was a union member. The Company's conduct can therefore be viewed as a violation of 8(a)(1) even if one assumes employee White was a front-line supervisor, simply because of the Company's awareness that she would most likely pass on the threats made to her to her fellow union employees with whom she had a close working relationship.
 
 
 12
 B. The 8(a)(3) and (1) Violations.
 
 
 13
 1. Pearl White. The Company admits that it discharged Pearl White on February 1, 1966 because of her union activities. The Company defends its action on the ground that White was a supervisor. As noted above, however, the Board found that she was not. The record makes clear that she (1) did not wear a badge designating her as a department head; (2) never attended a department head meeting; (3) never hired or fired another employee; (4) never recommended raises, or punished or reprimanded another employee; and (5) was described on the Company's records as a shoe clerk or sales lady rather than as the head of a separate shoe department. Although it does appear that White had some supervisory duties over shoe sales in the St. Albans store, the shoe 'department' was not clearly a separate department but instead was treated as part of the clothing department. For all these reasons, we conclude there is substantial evidence in the record as a whole to support the Board's conclusion that Pearl White was not a supervisor.
 
 
 14
 2. Discharge of Burlingame and Perkins. There is also adequate evidence to support the Board's conclusion that Perkins and Burlingame were discharged because of their union activity, and that the shopping reports which the Company claimed were the basis of the discharges were in fact simply a pretext. The record shows that (1) no other employees had ever been discharged on the basis of shoppers' reports before, (2) both employees were considered excellent workers before the reports, and (3) both were in fact praised by their supervisors shortly before their discharges.
 
 
 15
 The question as to the real reason for (a) discharge * * * (is) a question of fact to be decided by the National Labor Relations Board, which is empowered to consider circumstantial as well as direct evidence and where its finding is supported by circumstances, from which the conclusion of discriminatory discharge may be legitimately drawn, this Court may not substitute its judgment for that of the Board.
 
 
 16
 NLRB v. Lester Bros., Inc., 337 F.2d 706, 708 (4th Cir. 1964).
 
 
 17
 3. Transfer of Doss. Because of the fact that Doss was transferred out of the St. Albans store only a few days after Doss refused to assist the Company president by spying on the union activities of his fellow employees, and after the president had indicated that he knew there had been organizational meetings at Doss's house, the Board could reasonably infer that his transfer was a violation of 8(a)(3) and (1).
 
 
 18
 C. The 8(a)(5) Violation.
 
 
 19
 On January 31, 1966, Union representative Brooks called the president of the Company and told him that the Union represented a majority of the employees in the St. Albans store, excluding office clerical employees, guards, department heads, and supervisors. The president said he doubted this, and Brooks offered to show union authorization cards signed by a majority of the employees designating the Union as their representative for collective bargaining. The president said he was 'not interested,' and hung up.
 
 
 20
 To confirm this conversation, the Union then wrote the president a letter requesting representation and again offering to submit to a card check. In response to this letter, on February 3, 1966, the Company's attorney wrote:
 
 
 21
 It will be necessary for us to decline recognition of your union at this time, because: 1. In light of the questionable methods of securing signatures on cards in the past, we doubt that you have an uncoerced majority. 2. Another union has advised us that it has a substantial interest in the St. Albans store and it would be improper for us to extend recognition on the basis of your demand. 3. The unit demanded by you is inappropriate for collective bargaining purposes. I suggest you use the normal Board process as set out in Section 9 of the Act to establish if you represent a majority of the employees in the appropriate unit.
 
 
 22
 After a full hearing, the Board found that the unit in which the Union had requested recognition was appropriate, except that two office clerical employees who had not signed cards were also included.[6] The Board further found that at the time the Company refused to bargain with the Union, 23 out of the 41 employees in this unit had signed unambiguous authorization cards requesting that the Union represent them. This, the Board concluded, was a violation of 8(a)(5). The Board pointed out that a variance of two employees between the unit upon which recognition was requested, on the one hand, and the unit which the Board found appropriate, on the other, did not destroy the Union's majority. It also noted that this issue was not raised by the Company when it refused to recognize the Union, and the inclusion of the two clerical employees involved did not materially change the unit in which the demand was made, and did not affect the Union's majority status. It therefore concluded that this variance of two, in a unit of over forty employees was, on the facts of this case, clearly insubstantial.
 
 
 23
 The Board also found that the Company's refusal to bargain was not based on a good faith doubt of the Union's majority status. The Board concluded that the reasons given by the Company in its letter found no support in the evidence adduced at the hearing. The Company produced no evidence that 'another union' claimed a 'substantial interest' in organizing the St. Albans store. Furthermore, in no prior case involving the Union and the Company had the Board ever found that the Union had used cards with forged signatures. Finally, the Board felt it significant in this regard that the Company in fact made no effort of any kind to verify whether the Union had majority status.[7]
 
 
 24
 The Trial Examiner, in a decision adopted by the Board, concluded as follows:
 
 
 25
 Nor can there be any question but that the (Company) was motivated in refusing to recognize the Union here, not by any concern over whether the Union actually possessed authorizations to represent its employees, but by a desire to avoid, by whatever means possible, dealing with the Union for the working conditions of its employees. Since the means employed to accomplish that purpose consist of acts violative of the rights of the employees involved, the (Company) must be held to have refused in bad faith to recognize and bargain with the Union as the collective-bargaining representative of its employees. Therefore, on the evidence in the record as a whole, and for the reasons set forth, it is found that the (Company), by refusing to bargain with the Union on January 31, 1966, and thereafter violated Sections 8(a)(5) and (1) of the Act.
 
 
 26
 Since this case was taken under submission, the United States Supreme Court has held that, although an employer can 'insist that a union go to an election, regardless of his subjective motivation,' the Board nonetheless has the power to issue a bargaining order 'where an employer rejects a card majority while at the same time committing unfair labor practices that tend to undermine the union's majority and make a fair election an unlikely impossibility.' NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).
 
 
 27
 Because the Company's refusal to bargain in this case may be thought to have been accompanied by 'independent unfair labor practices which tend to preclude the holding of a fair election,' the bargaining order may be appropriate under the Gissel standard. It would appear, however, that a remand to the Board is in order in this case, as it was in the Fourth Circuit cases reviewed by the Court in Gissel. In this regard the Supreme Court said:
 
 
 28
 In the three cases in Nos. 573 and 691 from the Fourth Circuit, on the other hand, the Board did not make a similar finding that a bargaining order would have been necessary in the absence of an unlawful refusal to bargain. (The implicit reference is to a First Circuit case also before the Court.) Nor did it make a finding that, even though traditional remedies might be able to ensure a fair election, there was insufficient indication that an election (or a rerun in General Steel (General Steel Products, Inc. v. NLRB, 4 Cir., 398 F.2d 339)) would definitely be a more reliable test of the employees' desires than the card count taken before the unfair labor practices occurred. The employees argue that such findings would not be warranted, and the court below ruled in General Steel that available remedies short of a bargaining order could guarantee a fair election. 398 F.2d at 340, n. 3. We think it possible that the requisite findings were implicit in the Board's decisions below to issue bargaining orders (and to set aside the election in General Steel); and we think it clearly inappropriate for the court below to make any contrary finding on its own (see n. 32, supra). Because the Board's current practice at the time required it to phrase its findings in terms of an employer's good- or badfaith doubts (see Part II, supra), however, the precise analysis the Board now puts forth was not employed below, and we therefore remand these cases to the Board for proper findings.
 
 
 29
 In the light of these observations, a remand of this case appears to be required because the Board neither
 
 
 30
 (a) made a finding that 'a bargaining order would have been neces sary in the absence of an unlawful refusal to bargain'; nor
 
 
 31
 (b) made findings that 'less pervasive practices' of the employer have enough of a 'tendency to undermine majority strength and impede the election process' to justify a bargaining order in a case such as this where it appears that the Union had majority status, and the Company refused a request to bargain in violation of 8(a)(5).
 
 
 32
 As was true in the Fourth Circuit cases considered in Gissel, 'it (is) possible that the requisite findings were implicit in the Board's' decision. However, since the Board's decision below was phrased 'in terms of an employer's good- or badfaith doubts,' and not in terms of the standard now adopted by Gissel, No. 21,921 should, in respect of the bargaining order, be remanded 'to the Board for proper findings.'
 
 II
 
 33
 Coincidental with the remand of No. 21,921 for the limited purpose hereinabove specified, we think it appropriate to remand No. 21,809 to give the Board an opportunity to reexamine the words of its remedial order with regard to the Company's right to proscribe solicitation and distribution. In both its brief and on oral argument before us, the Board acknowledged that it did not intend to allow the Company to prohibit solicitation and distribution on behalf of the Union in the Company's parking lot by employees during their nonworking hours. It appears that the Trial Examiner's order would have guaranteed the employees the right during nonworking time to solicit anywhere on Company premises and to distribute literature in all nonworking areas. The Board's order would, however, appear to limit the employees' rights of solicitation to nonpublic areas during nonworking time, and their rights of distribution to nonpublic, nonworking areas during nonworking time. In light of the Board's representations to us in its brief and on oral argument, there is at the least an ambiguity with respect to the parking lot which warrants deferment by us of a definitive disposition of No. 21,809 until the Board has reviewed its order again.
 
 
 34
 Enforcement is granted in No. 21,921 in all respects except as to the bargaining order for which a remand is directed for further consideration in the light of NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Remand is also directed of No. 21,809 for the reason stated hereinabove.
 
 
 35
 It is so ordered.
 
 
 
 [1]
 The Notice read 'NO SOLICITING OR DISTRIBUTING LITERATURE TO OR BY EMPLOYEES WHILE WORKING.'
 
 
 [2]
 The rule stated: 'No solicitation, either by employees or others, will be permitted on the premises, without the express written permission of the store manager. Upon observing any such solicitating, please report the same to the store manager.'
 
 
 [3]
 May Dept. Stores Co., 59 N.L.R.B. 976, 981 (1944), enforced 154 F.2d 533 (8th Cir.), cert. denied, 329 U.S. 725, 67 S.Ct. 72, 91 L.Ed. 627 (1946)
 
 
 [4]
 Montgomery Ward & Co. v. NLRB, 339 F.2d 889, 891-894 (6th Cir. 1965); see May Dept. Stores Co., supra note 3
 
 
 [5]
 See James H. Matthews & Co. v. NLRB, 354 F.2d 432, 440-441 (8th Cir. 1965), cert. denied, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966); NLRB v. Walton Mfg. Co., 289 F.2d 177, 180-181 (5th Cir. 1961)
 
 
 [6]
 The Company also contends that the Board improperly denied the Company's motion to reopen the hearing to permit it to introduce evidence that the appropriate unit in this case included all of the Company's stores. As the Trial Examiner pointed out, however, there was no claim that the 'evidence proffered (was) newly discovered or otherwise previously unavailable,' nor that the Company was denied an adequate opportunity to 'state and litigate its position with respect to the (unit issue).' Furthermore, when judged by the standards of review established by this court, there is no basis for an assumption that the Board's unit determination was erroneous. See Local 1325, Retail Clerks International Ass'n v. NLRB, 134 U.S.App.D.C. 298, 414 F.2d 1194 (Decided July 2, 1969)
 
 
 [7]
 At the unfair labor practice hearing the personnel manager of the Company, who was the only witness to testify as to the Company's reasons for refusing to bargain with the Union, stated that he personally did not know the reason why the Company had refused to bargain with the Union. He further acknowledged that the Company had made no effort to find out whether any or all of the employees had in fact signed union cards because 'some of the cards we had had in other hearings had been thrown out because they were, the names were supposedly forged on them. The writing was in two different people's handwriting and things like this.'